EXHIBIT 4

**HON. JAMAL N. WHITEHEAD**

# UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF WASHINGTON

## AT SEATTLE

| | |
|---|---|
| VALVE CORPORATION, | Case No. 2:23-cv-1016 |
| Plaintiff, | **SECOND AMENDED COMPLAINT FOR DECLARATORY JUDGMENT OF INVALIDITY AND UNENFORCEABILITY OF U.S. PATENT NO. 8,856,221; BREACH OF CONTRACT; AND BAD FAITH ASSERTION OF PATENT INFRINGEMENT** |
| v. | |
| LEIGH ROTHSCHILD, ROTHSCHILD BROADCAST DISTRIBUTION SYSTEMS, LLC, DISPLAY TECHNOLOGIES, LLC, PATENT ASSET MANAGEMENT, LLC, MEYLER LEGAL, PLLC, AND SAMUEL MEYLER, | |
| | Complaint Filed: 07/07/2023 |
| Defendants. | JURY TRIAL DEMANDED |

1.     Plaintiff Valve Corporation ("Valve"), through its undersigned counsel, hereby alleges as follows against Defendants Leigh Rothschild; Rothschild Broadcast Distribution Systems, LLC; Display Technologies LLC; Patent Asset Management, LLC; Meyler Legal, PLLC; and Samuel Meyler (collectively, "Defendants"):

## I.    NATURE AND HISTORY OF THE ACTION

### A.    Defendants' tactics forced Valve to seek its requested relief to put an end to their bad-faith assertions of patent infringement.

2.     This is an action that seeks various forms of relief due to Defendants' bad faith assertions of patent infringement against Valve.

PLAINTIFF'S SECOND AMENDED COMPLAINT FOR DECLARATORY JUDGMENT
Case No. 2:23-cv-1016

1

Kilpatrick Townsend & Stockton LLP,
1420 Fifth Avenue, Suite 3700
Seattle, WA  98101
(206) 467-9600)

3.     First, Valve seeks a declaratory judgment that U.S. Patent No. 8,856,221 ("the '221 Patent"), which Defendants have asserted against Valve, is invalid.

4.     Second, Valve seeks a declaratory judgment that the '221 Patent is unenforceable against it as Valve is a licensee to the '221 Patent under the 2016 Global Settlement and License Agreement (Ex. 1) between Valve and Defendants Leigh Rothschild and Display Technologies, LLC.

5.     Third, Valve seeks a judgment that Defendants breached the 2016 Global Settlement and License Agreement by: threatening to sue Valve for infringement of the licensed '221 Patent; demanding additional monetary payments from Valve to avoid that lawsuit; suing Valve for infringement of licensed U.S. Patent No. 9,300,723; and by failing to withdraw their threat over U.S. Patent No. 9,300,723.

6.     Fourth, Valve seeks a judgment that Defendants violated Revised Code of Washington ("RCW") 19.350 (the Patent Troll Prevention Act) and RCW 19.86.020 (the Washington State Consumer Protection Act) by making bad faith assertions of patent infringement against Valve.

**B.     Defendants are patent trolls engaged in a pattern of unseemly litigation tactics, often based on objectively baseless allegations.**

7.     Upon information and belief, Defendant Rothschild Broadcast Distribution Systems ("RBDS"), the owner of the '221 Patent, does not make, use, or sell any products or services of its own, but is solely in the business of patent licensing through the threat of litigation, a pattern of behavior indicative of entities commonly referred to as "patent trolls."

8.     Upon information and belief, RBDS's sole business model and activity involves making accusations of patent infringement to extract licensing payments from practicing entities. RBDS has filed over 100 lawsuits in furtherance of that goal.

9.     Upon information and belief, Defendant Leigh Rothschild ("Rothschild") owns or controls dozens of companies, including RBDS. The sole

PLAINTIFF'S SECOND AMENDED COMPLAINT FOR DECLARATORY JUDGMENT
Case No. 2:23-cv-1016

2

Kilpatrick Townsend & Stockton LLP,
1420 Fifth Avenue, Suite 3700
Seattle, WA 98101
(206) 467-9600)

1  purpose of the Rothschild companies is to accuse others of patent infringement. The

2  goal of these accusations is to extract a quick settlement from the accused infringers

3  rather than actually litigate the merits of the infringement claims. Ex. 2 (*Stupid Patent*

4  *of the Month: "Internet drink mixer" vs. everyone*, https://arstechnica.com/tech-

5  policy/2015/09/stupid-patent-of-the-month-internet-drink-mixer-vs-everyone/).

6       10.    Entities owned by Rothschild have filed over a thousand patent

7  infringement lawsuits. Ex. 3 (*NPE Showcase – Leigh Rothschild*,

8  https://www.gadgetsgigabytesandgoodwill.com/2023/05/npe-showcase-leigh-

9  rothschild/). In some instances, the defendants chose to fight rather than pay

10  nuisance-value settlements. Courts have found such lawsuits brought by Rothschild

11  entities to be objectively baseless, resulting in fees and other penalties against the

12  Rothschild entities. Ex. 4 (*Federal Circuit Hits Stupid Patent Owner With Fee*

13  *Award*, https://www.eff.org/deeplinks/2017/06/federal-circuit-hits-stupid-patent-

14  owner-fee-award).

15      **C.**    **Rothschild-controlled entities have engaged in a pattern of accusing**
            **Valve of infringement based on patents that they already licensed**

16              **to Valve.**

17       11.    On June 8, 2015, Display Technologies, an entity controlled by

18  Rothschild, filed suit against Valve, accusing it of infringing U.S. Patent

19  No. 8,671,195.

20       12.    On November 14, 2016, Display Technologies and Valve entered into

21  the 2016 Global Settlement and License Agreement. In that agreement, Display

22  Technologies granted Valve a "perpetual, irrevocable, royalty-free, fully paid-up,

23  worldwide license" to all patents listed in Exhibit C of the settlement agreement, as

24  well as "all continuations, divisionals, continuations-in-part, extensions, reissues,

25  reexaminations, and any other patents or patent applications claiming priority to or

26  through the patents identified in Exhibit C." Ex. 1 at 2. Valve paid to obtain these

27  rights. Ex. 1 at 5-6.

28

PLAINTIFF'S SECOND AMENDED COMPLAINT
FOR DECLARATORY JUDGMENT       3
Case No. 2:23-cv-1016

Kilpatrick Townsend & Stockton LLP,
1420 Fifth Avenue, Suite 3700
Seattle, WA 98101
(206) 467-9600)

13. Rothschild signed the 2016 Global Settlement and License Agreement on behalf of himself, Display Technologies, and all entities listed as "Assignee" in Exhibit C to the agreement. Ex. 1 at 14 & 18-19.

14. In March 2022, Daniel Falcucci, the Director of Business Development at Defendant Patent Asset Management ("PAM"), began sending numerous emails and messages to members of Valve's legal team, including LinkedIn messages, requesting that Valve execute a new license with Rothschild and his various entities for more money. Mr. Falcucci stated that PAM was headed by Rothschild, and that it was Mr. Falcucci's understanding that PAM had signed the 2016 Global Settlement and License Agreement with Valve. Ex. 5 (LinkedIn message from Daniel Falcucci to Valve). Nonetheless, Mr. Falcucci repeatedly urged Valve to negotiate a new licensing agreement with Rothschild. *Id*. As one example, Mr. Falcucci sent a LinkedIn message to a member of Valve's legal team offering an "opportunity" to enter into a new agreement with PAM, and further offered to present what PAM called its "inventory catalog" upon request. *Id*. The referenced "inventory catalog" is nothing but a list of patents that Rothschild entities routinely assert against companies that are developing and manufacturing actual useful products. PAM's inventory catalog it presented to Valve included multiple patents that Valve already licensed in the 2016 Global Settlement and License Agreement.

15. Listed in the inventory catalog as part of PAM's "featured inventory" that was "not subject to an agreement" between Valve and Rothschild and that Rothschild now wanted Valve to take a license to were United States Patent Nos. 8,617,160 and 9,402,664. Both patents claim devices and methods for implanting nails into human bone during a medical procedure to facilitate fracture healing.

16. Valve is not, and never has been, in the business of developing or selling any products in the medical field, let alone specific, FDA-regulated surgical tools like the kind PAM was offering to license to Valve.

PLAINTIFF'S SECOND AMENDED COMPLAINT
FOR DECLARATORY JUDGMENT
Case No. 2:23-cv-1016

4

Kilpatrick Townsend & Stockton LLP,
1420 Fifth Avenue, Suite 3700
Seattle, WA 98101
(206) 467-9600)

17.     None of Mr. Falcucci's messages ever provided any analysis of which Rothschild patents Valve was supposedly practicing or which of Valve's products were supposedly practicing those patents—only that Valve should pay PAM and Rothschild more money.

18.     Mr. Falcucci's demands included that Valve take a license to at least two patents assigned to Display Technologies, U.S. Patent Nos. 8,671,195 and 9,300,723. Valve, however, already has a license to both of those patents under the 2016 Global Settlement and License Agreement.

19.     Shortly after Mr. Falcucci's string of demand messages, Display Technologies sued Valve in this Court for patent infringement. *See Display Technologies LLC v. Valve Corporation*, 2-22-cv-01365 (W.D. Wash. Sept. 27, 2022).

20.     Defendants Samuel Meyler ("Meyler") and Meyler Legal, PLLC (collectively, "Meyler Defendants") represented Display Technologies in its 2022 lawsuit against Valve.

21.     Display Technologies asserted infringement of U.S. Patent No. 9,300,723, which is a continuation of U.S. Patent No. 8,671,195, the patent originally asserted against Valve that led to the 2016 Global Settlement and License Agreement. Accordingly, U.S. Patent No. 9,300,723 is covered under the parties' 2016 Global Settlement and License Agreement. Display Technologies' suit against Valve in 2022 was thus a breach of that agreement.

22.     Valve informed Display Technologies that Valve had a license to U.S. Patent No. 9,300,723 under the 2016 Global Settlement and License Agreement. In doing so, Valve sent the 2016 Global Settlement and License Agreement to the Meyler Defendants twice, once in October and once in December 2022. In its December letter, Valve explained the history of the 2015 litigation between Display Technologies and Valve and informed the Meyler Defendants that "[t]he Global

PLAINTIFF'S SECOND AMENDED COMPLAINT
FOR DECLARATORY JUDGMENT
Case No. 2:23-cv-1016

5

Kilpatrick Townsend & Stockton LLP,
1420 Fifth Avenue, Suite 3700
Seattle, WA 98101
(206) 467-9600)

1    Agreement granted Valve a license to all of Rothschild's patents that could
2    conceivably be construed to cover any portion of Valve's business." Ex. 6 at 1.

3        23.    Display Technologies voluntarily dismissed its lawsuit on October 13,
4    2022, but did so without prejudice. *See Display Technologies LLC v. Valve*
5    *Corporation*, Case No. 2:22-cv-01365, Dkt. 6 (W.D. Wash. Sept. 27, 2022) (Ex. 7).

6        24.    Since dismissing that case without prejudice, Mr. Falcucci has not
7    withdrawn or retracted his demands, made on behalf of Rothschild and PAM, that
8    Valve take a license to patents owned by Display Technologies that are already
9    covered under the 2016 Global Settlement and License Agreement (including U.S.
10   Patent No. 9,300,723).

11       25.    Defendants' improper threats to sue Valve for patent infringement on
12   patents Valve already had a license to did not end there.

13       26.    On June 21, 2023, the Meyler Defendants sent a letter to Valve on behalf
14   of a *different* Rothschild-controlled entity—RBDS—threatening to file another
15   lawsuit against Valve, this time alleging infringement of the '221 Patent if Valve did
16   not negotiate a resolution of RBDS's claims. Ex. 8 (Meyler letter to Valve).

17       27.    For the second time in less than a year, Rothschild and PAM, this time
18   through RBDS, are threatening to sue Valve for infringement of a patent that Valve is
19   already a licensee to under the 2016 Global Settlement and License Agreement.

20       28.    The '221 Patent is expressly listed as one of the licensed patents in
21   Exhibit C of the 2016 Global Licensing and Settlement Agreement. Ex. 1 at 19. Less
22   than five minutes of due diligence—namely, reviewing the licensing agreement—
23   would have confirmed that Valve is licensed to the '221 Patent.

24       29.    Because Valve had already sent the agreement to the Meyler Defendants,
25   on information and belief, they were aware of its terms when Mr. Meyler sent the
26   June 21, 2023, letter to Valve.

27       30.    Prior to filing the 2022 lawsuit alleging infringement of United States
28   Patent No. 9,300,723 on behalf of Rothschild-controlled Display Technologies,

PLAINTIFF'S SECOND AMENDED COMPLAINT
FOR DECLARATORY JUDGMENT                    6
Case No. 2:23-cv-1016

Kilpatrick Townsend & Stockton LLP,
1420 Fifth Avenue, Suite 3700
Seattle, WA 98101
(206) 467-9600)

Meyler was required by Washington Rule of Professional Conduct 3.1 and Federal Rule of Civil Procedure 11 to investigate the basis for Display Technologies' claims.

31.    At a minimum, Meyler's investigation should have included a review of the 2016 Global Settlement and License Agreement between Display Technologies and Valve, which would have informed him of the numerous patents to which Valve was already licensed.

32.    The most-recent demand letter, combined with the fact that Display Technologies already sued Valve for infringement of a patent it has a license to, demonstrates that it is highly likely one or more Defendants will sue Valve for infringement of the '221 Patent.

33.    In the meantime, the cloud of Defendants' improper infringement allegations hangs over Valve, its products, and its services. Defendants' actions have created an actual, justiciable, substantial, and immediate controversy between Valve and Defendants as to whether the '221 Patent claims are valid, and whether those claims are enforceable against Valve.

34.    A judicial declaration is necessary to determine the respective rights of the parties regarding the '221 Patent, and Valve respectfully seeks a judicial declaration that the '221 Patent is invalid and unenforceable against Valve.

35.    On information and belief, Rothschild, RBDS, Display Technologies, and PAM are highly assertive entities whose entire business model is to make bad faith assertions of patent infringement in the hopes of obtaining a quick settlement payment. The Meyler Defendants knowingly and willingly assisted in making such claims against Valve and, presumably, other companies as well. The assertions raised against Valve by the collective Defendants are in violation of RCW 19.350 because they are objectively and subjectively baseless allegations that Valve is infringing a patent to which Valve already has a license. Defendants' bad faith assertions of patent infringement resulted in Valve spending unnecessary money on legal fees to defend itself against these baseless claims.

PLAINTIFF'S SECOND AMENDED COMPLAINT
FOR DECLARATORY JUDGMENT
Case No. 2:23-cv-1016

7

Kilpatrick Townsend & Stockton LLP,
1420 Fifth Avenue, Suite 3700
Seattle, WA  98101
(206) 467-9600)

## II.    THE PARTIES

36.    Valve Corporation is a software and videogame developer with its primary place of business at 10400 NE 4th St. Fl. 14, Bellevue, WA 98004.

37.    On information and belief, Leigh Rothschild resides at 1801 NE 123rd St. North, Miami, FL 33181.

38.    RBDS is a corporation organized and existing under the laws of the state of Texas with a registered physical address of 1 East Broward Boulevard, Suite 700, Ft. Lauderdale, FL 33301.

39.    RBDS owns the rights to the '221 Patent, which it has asserted at least 120 times against companies across a wide range of industries. No party that contested infringement has ever been found by a federal court to infringe the '221 Patent.[1] In each of its cases, RBDS dismissed the lawsuit prior to claim construction.

40.    Display Technologies is a corporation organized and existing under the laws of the state of Texas with a registered physical address of 1 East Broward Boulevard, Suite 700, Ft. Lauderdale, FL 33301.

41.    PAM is a corporation organized and existing under the laws of the state of Florida, with a registered physical address of 1 East Broward Boulevard, Suite 700, Fort Lauderdale, FL, 33301.

42.    Rothschild is the registered agent of PAM.

43.    PAM owns 100% of RBDS and Display Technologies. Dkt. 21.

44.    Upon information and belief, Display Technologies, RBDS, and PAM are controlled by Rothschild and are used by him for the sole purpose of asserting patent infringement claims. PAM owns 100% of each of RBDS and Display Technologies. Dkt. 21.

---

[1] In one instance a party did not answer RBDS's complaint, and thus was found to infringe the '221 Patent by default.

PLAINTIFF'S SECOND AMENDED COMPLAINT
FOR DECLARATORY JUDGMENT
Case No. 2:23-cv-1016

8

Kilpatrick Townsend & Stockton LLP,
1420 Fifth Avenue, Suite 3700
Seattle, WA 98101
(206) 467-9600)

45.     Samuel Meyler is an attorney licensed in Washington State. Meyler is the sole practitioner of Meyler Legal, PLLC, having a registered place of business at 1700 Westlake Ave N Ste 200, Seattle, WA 98109-6212.

46.     Rothschild signed and submitted the patent assignment agreement transferring rights to the '221 Patent from one of his controlled entities, Ariel Inventions, to another of his controlled entities, RBDS. Ex. 9 (Patent Assignment Cover Sheet). Rothschild signed on behalf of both parties to the assignment.

47.     Despite being personally informed that Valve previously executed the 2016 Global Settlement and License Agreement with Rothschild, and being sent a copy of that agreement, Meyler, on his firm's letterhead, authored and sent the June 2023 demand letter to Valve that threatens a lawsuit based on the '221 Patent, a patent explicitly listed in the 2016 Global Settlement and License Agreement.

## III.    JURISDICTION AND VENUE

48.     This action arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, under the Patent Laws of the United States, 35 U.S.C. §§ 1 *et seq.* This action also arises under the Patent Troll Prevention Act enacted by the state of Washington at RCW 19.350 prohibiting bad faith assertion of patent infringement, and RCW 19.86.020, the Washington State Consumer Protection Act.

49.     This Court has subject matter jurisdiction over the claims alleged in this action at least under 28 U.S.C. §§ 1331, 1338, 2201, and 2202, because this Court has exclusive jurisdiction over declaratory judgment claims arising under the Patent Laws pursuant to these statutes.

50.     This Court has supplemental jurisdiction over Valve's state claims under 28 U.S.C § 1367, as Valve's state law claims arise out of the same case or controversy as its claims for which this Court has original jurisdiction.

51.     This Court has personal jurisdiction over Defendants because they acted in concert to conduct substantial business in this District, including regularly doing or soliciting business, engaging in other persistent courses of conduct, suing other

PLAINTIFF'S SECOND AMENDED COMPLAINT
FOR DECLARATORY JUDGMENT
Case No. 2:23-cv-1016

9

Kilpatrick Townsend & Stockton LLP,
1420 Fifth Avenue, Suite 3700
Seattle, WA 98101
(206) 467-9600)

companies in this District on the '221 Patent, and deriving substantial revenue from individuals and entities in Washington. Rothschild-controlled entities routinely avail themselves of the Washington Federal District Courts as a forum for asserting infringement against Washington companies. *See, e.g.*, *Rothschild Broadcast Distrib. Sys., LLC* v. *CreativeLive Inc*, No. 2-22-cv-00771 (W.D. Wash. June 2, 2022); *Display Technologies LLC v. Valve Corp.*, No. 2-22-cv-01365 (W.D. Wash. Sept. 27, 2022).

52.  The 2022 demand letters from Falcucci were made on behalf of both Rothschild and PAM, requested that Valve take a license to patents assigned to RBDS and Display Technologies, were sent to Valve's headquarters in Washington, and sought additional royalty payments from Valve.

53.  Shortly after Mr. Falcucci sent these demand letters on behalf of Rothschild and PAM, Display Technologies, represented by the Meyler Defendants, filed suit against Valve at Rothschild's directive.

54.  Accordingly, each Defendant purposefully and repeatedly directed its activities at residents of Washington. On information and belief, Rothschild's companies have sent letters to numerous other entities, including numerous other companies based in Washington, asserting infringement of the '221 Patent and demanding payment of money. Thus, Defendants have sufficient minimum contacts with the State of Washington to satisfy the Washington long-arm statute (RCW 4.28.185) and Constitutional due process requirements because Defendants regularly conduct business activities in Washington.

55.  This Court further has personal jurisdiction over the Meyler Defendants because both are domiciled in this jurisdiction.

56.  Venue in this District is proper under 28 U.S.C. §§ 1391(b), (c), and (d) with respect to Valve's particular claims against all Defendants.

PLAINTIFF'S SECOND AMENDED COMPLAINT
FOR DECLARATORY JUDGMENT
Case No. 2:23-cv-1016

10

Kilpatrick Townsend & Stockton LLP,
1420 Fifth Avenue, Suite 3700
Seattle, WA 98101
(206) 467-9600)

1   **IV.   THE '221 PATENT**

2   57.   The '221 Patent issued on October 7, 2014, to Rothschild and is titled

3   "System and method for storing broadcast content in a cloud-based computing

4   environment." The '221 Patent is currently assigned to RBDS.

5   58.   The '221 Patent is listed in Exhibit C to the 2016 Global Settlement and

6   License Agreement as one of the Licensed Patents. Ex. 1 at 19 (Patent No. 12).

7   **V.   COUNT I: DECLARATORY JUDGEMENT THAT THE '221 PATENT IS INVALID**

8

9   55.   Valve incorporates by reference the preceding paragraphs of this

10  Complaint.

11  56.   In view of the facts and allegations set forth above, there is an actual,

12  justiciable, substantial, and immediate controversy between Valve and RBDS

13  regarding the validity of the '221 Patent. Absent a declaration of invalidity, RBDS

14  will continue to assert the '221 Patent wrongfully, thereby injuring Valve.

15  57.   As Valve explains throughout this Complaint and in Count III for Breach

16  of Contract, incorporated by reference herein, Defendants behave as if compliance

17  with the 2016 Global Settlement and License Agreement was optional. To avoid any

18  doubt, the existence of that agreement and its covenant not to sue does not negate the

19  case or controversy between Valve and Defendants because of Defendants' pattern of

20  past and ongoing violations of that agreement. This is that unique case where a

21  covenant not to sue between the parties fails to provide Valve with the protection it

22  paid for because, unfortunately, the assurances given to Valve in that agreement are

23  worthless. Judicial intervention is therefore necessary to give Valve the rights it paid

24  for, but that Defendants have denied it.

25  58.   The '221 patent is invalid for failure to meet one or more of the

26  conditions of patentability under the patent laws of the United States, 35 U.S.C. § 1 *et*

27  *seq*., including, but not limited to, 35 U.S.C. §§ 101, 102, 103, and/or 112, and Valve

28  is entitled to a declaration to that effect. By way of non-limiting example, upon

PLAINTIFF'S SECOND AMENDED COMPLAINT
FOR DECLARATORY JUDGMENT
Case No. 2:23-cv-1016

11

Kilpatrick Townsend & Stockton LLP,
1420 Fifth Avenue, Suite 3700
Seattle, WA 98101
(206) 467-9600)

information and belief, the claims of the '221 Patent are invalid as obvious under U.S. Patent Application Publication No. 2008/0155059, titled "Methods and apparatus for supporting content distribution," alone or alternatively in view of U.S. Patent No. 7,684,673 titled "Managing a digital video recorder via a network."

## VI. COUNT II: DECLARATORY JUDGEMENT THAT THE '221 PATENT IS UNENFORCEABLE AGAINST VALVE

59. Valve incorporates by reference the preceding paragraphs of this Complaint.

60. Valve received a "perpetual, irrevocable, royalty-free, fully paid-up, worldwide license" to the '221 Patent by signing the 2016 Global Settlement and License Agreement.

61. That Agreement applies with equal force to RBDS as it did to Ariel Inventions LLC, the Rothschild-controlled entity that was assigned the '221 Patent when the 2016 Global Settlement and License Agreement was signed. Indeed, Section 7.2 of the agreement states that "Licensor may not assign, or exclusively license, any of the Licensed Patents without such assignee or licensee agreeing to be bound by the obligations of the Licensor hereunder as if it were a party hereto, and any assignment or exclusive license made in violation of this provision shall be void." Ex. 1 at 7.

62. As discussed above, because Defendants behave as if compliance with the 2016 Global Settlement and License Agreement is optional, judicial intervention is necessary to give Valve the rights it paid for, but that Defendants have denied it.

63. Valve thus is entitled to judgment declaring that the '221 Patent is unenforceable against Valve, and that no party can file suit against it for infringement of the '221 Patent.

64. Valve has no adequate remedy at law for its declaratory judgment claims.

PLAINTIFF'S SECOND AMENDED COMPLAINT
FOR DECLARATORY JUDGMENT
Case No. 2:23-cv-1016

12

Kilpatrick Townsend & Stockton LLP,
1420 Fifth Avenue, Suite 3700
Seattle, WA 98101
(206) 467-9600)

1   **VII.  COUNT III: BREACH OF CONTRACT**

2       65.     Valve incorporates by reference the preceding paragraphs of this

3   Complaint.

4       66.     Section 3.1 of the 2016 Global Settlement and License Agreement is

5   titled "Licensor License to Licensee" and states "No royalties or additional payments

6   of any kind shall be required in order to maintain this Agreement in force." Ex. 1.

7       67.     Section 3.2 of the 2016 Global Settlement and License Agreement is

8   titled "Covenant Not to Sue Licensee" and states "Licensor covenants not to sue

9   Licensee or its Affiliates for actual or alleged infringement of the Licensed Patents."

10  Ex. 1.

11      68.     Valve fully performed its obligations under the 2016 Global Settlement

12  and License Agreement.

13      69.     As a condition of being assigned the '221 Patent, RBDS is bound by the

14  2016 Global Settlement and License Agreement as if it was an original signatory to

15  the agreement.

16      70.     As the original signatory to the 2016 Global Settlement and License

17  Agreement, Display Technologies is bound by the agreement.

18      71.     The "potential resolution" and "resolution" discussed in the 2023

19  demand letter sent by Meyler on behalf of Rothschild and RBDS is a monetary

20  payment for additional rights to patents to which Valve is already licensed, including

21  the '221 Patent.

22      72.     RBDS breached at least Section 3.1 and anticipatorily breached

23  Section 3.2 (and therefore breached the 2016 Global Settlement and License

24  Agreement) when it asserted the '221 Patent against Valve in its most recent demand

25  letter.

26      73.     RBDS repudiated its covenant not to sue Valve by expressly threatening

27  to sue Valve if it did not pay additional money to RBDS. Ex. 8 at 1.

28

PLAINTIFF'S SECOND AMENDED COMPLAINT
FOR DECLARATORY JUDGMENT                13
Case No. 2:23-cv-1016

Kilpatrick Townsend & Stockton LLP,
1420 Fifth Avenue, Suite 3700
Seattle, WA 98101
(206) 467-9600)

74.    In other words, RBDS made a positive statement indicating distinctly and unequivocally that it would not substantially perform its obligations under the covenant not to sue without receiving additional monetary payment that goes beyond Valve's payment obligations under the 2016 Global Settlement and License Agreement.

75.    As noted above, RBDS also breached Section 3.1 of the 2016 Global Settlement and License Agreement by demanding additional payment for rights to patents licensed to Valve in the 2016 Global Settlement and License Agreement.

76.    Further, Display Technologies breached the covenant not to sue when it asserted U.S. Patent No. 9,300,723 in its 2022 lawsuit against Valve and continues to be in breach by failing to withdraw the 2022 demands from Mr. Falcucci.

77.    As explained above, Rothschild owns, controls, and directs the actions of RBDS and Display Technologies. As a signatory to the 2016 Global Settlement and License Agreement, Rothschild is also in breach and/or has anticipatorily breached the 2016 Global Settlement and License Agreement.

## VIII.    COUNT IV: VIOLATION OF WASHINGTON UNFAIR BUSINESS PRACTICES AND BAD FAITH ASSERTIONS OF PATENT INFRINGEMENT, RCW 19.86 AND 19.350

78.    Valve incorporates by reference the preceding paragraphs of this Complaint.

79.    Defendants made a pre-suit assertion of patent infringement by sending the March 2022 demands to Valve, which falsely and misleadingly requested that Valve pay additional fees to obtain a license to U.S. Patents 8,671,195 and 9,300,723, patents owned by Display Technologies to which Valve already had a license.

80.    Defendants have not withdrawn Mr. Falcucci's demands.

81.    Defendants made another pre-suit assertion of patent infringement by sending the June 2023 demand letter to Valve, which claimed that Valve has infringed the '221 Patent and encouraged Valve to obtain a license to the '221 Patent

PLAINTIFF'S SECOND AMENDED COMPLAINT
FOR DECLARATORY JUDGMENT
Case No. 2:23-cv-1016

14

Kilpatrick Townsend & Stockton LLP,
1420 Fifth Avenue, Suite 3700
Seattle, WA 98101
(206) 467-9600)

1    to avoid litigation. This threat, like the March 2022 threat, was made outside the

2    context of active litigation between Defendants and Valve.

3        82.    Defendants' pre-suit threats to sue Valve for infringing <u>licensed</u> patents

4    are bad faith assertions of patent infringement and in violation of RCW 19.350 (the

5    Patent Troll Prevention Act).

6        83.    Defendants sent the June 2023 demand letter when no judicial

7    proceeding or litigation was pending between Defendants and Valve.

8        84.    The June 2023 letter was emailed directly to a member of Valve's legal

9    team.

10        85.    The June 2023 letter did not attach any complaints or other proposed

11    judicial pleadings that Meyler intended to file. Instead, the letter explained that Valve

12    could take a license as a way of avoiding litigation.

13        86.    To avoid any doubt, this demand letter was a private communication

14    between two private parties outside of the context of any judicial or quasi-judicial

15    proceeding.

16        87.    Defendants' assertion that Valve infringed licensed patents, such as the

17    '221 Patent, was made in bad faith.

18        88.    Defendants' bad faith assertion of infringement imposed a significant

19    burden on Valve because Valve must now, yet again, expend resources to defend

20    itself against meritless infringement allegations.

21        89.    The following non-exclusive factors enumerated under RCW 19.350

22    weigh in favor of a judicial finding that Defendants' threat of infringement against

23    Valve was made in bad faith:

24            a.    19.350.020(2)(d): "The person threatens legal action that cannot

25    legally be taken." As explained above, Valve has a worldwide, perpetual license to

26    the '221 Patent. While Defendants have routinely disregarded their legal obligations

27    under the parties' agreement—thus requiring the relief requested through this

28    lawsuit—the fact remains that Defendants legally cannot sue Valve for infringement

PLAINTIFF'S SECOND AMENDED COMPLAINT
FOR DECLARATORY JUDGMENT                    15
Case No. 2:23-cv-1016

Kilpatrick Townsend & Stockton LLP,
1420 Fifth Avenue, Suite 3700
Seattle, WA  98101
(206) 467-9600)

of the '221 Patent or any other patent covered by the 2016 license, yet have threatened, and even taken, legal action against Valve contrary to the terms of the agreement.

       b.    19.350.020(2)(f): "The person, or a subsidiary or an affiliate of the person, has previously filed or threatened to file one or more lawsuits based on the same or substantially equivalent assertion of patent infringement, and a court found the person's assertion to be without merit or found the assertion contains false, misleading, or deceptive information."

       i.    Upon information and belief, RBDS or another Rothschild-controlled entity has asserted the '221 Patent against at least 127 different companies spanning hundreds of technological fields, industries, services, and products. The only reason that a court has not previously found the assertions of the '221 Patent to be meritless is because these Rothschild-controlled entities exact a quick settlement fee far below the costs to litigate and/or voluntarily dismiss their lawsuits when presented with arguments over the non-infringement and/or invalidity of the asserted patents.

       ii.    As noted above and expanded upon below, however, courts have found that patent claims made by other Rothschild-controlled entities are without merit. Indeed, on information and belief, Defendants, or a subsidiary or an affiliate of one or more Defendants, made substantially equivalent assertions of patent infringement that a court found to be so lacking in merit that it awarded fees to the opposing party.

       iii.    For example, in the case referenced in attached Ex. 4, *Rothschild Connected Devices Innovations, LLC v. Guardian Prot. Servs., Inc.*, No. 2:15-cv-01431 (E.D. Tex.),

PLAINTIFF'S SECOND AMENDED COMPLAINT
FOR DECLARATORY JUDGMENT
Case No. 2:23-cv-1016

16

Kilpatrick Townsend & Stockton LLP,
1420 Fifth Avenue, Suite 3700
Seattle, WA 98101
(206) 467-9600)

the Rothschild plaintiff accused a company of infringing one of the many patents naming Leigh Rothschild as its inventor. Rothschild ultimately voluntarily moved to dismiss the action, which the district court granted while concurrently denying the opposing party's motion for attorney fees. *Rothschild Connected Devices Innovations, LLC v. Guardian Prot. Servs., Inc.*, 858 F.3d 1383, 1386 (Fed. Cir. 2017).

iv. Upon remand from the Federal Circuit, the district court ordered the Rothschild plaintiff to pay "the full amount of fees [the opposing party] seeks." *Rothschild Connected Devices Innovations, LLC v. ADS Sec., L.P.*, No. 2:15-cv-01431, 2017 WL 5178998, at *2 (E.D. Tex. Nov. 8, 2017).

v. In its opinion, the Federal Circuit held (*Rothschild*, 858 F.3d at 1390 (emphasis added)):

*[T]he undisputed evidence regarding Rothschild's vexatious litigation warrants an affirmative exceptional case finding here. See Newegg*, 793 F.3d at 1350 ("[A] pattern of litigation abuses characterized by the repeated filing of patent infringement actions for the sole purpose of forcing settlements, with no intention of testing the merits of one's claims, is relevant to a district court's exceptional case determination under § 285."); *see also Eon–Net*, 653 F.3d at 1327 (noting that settlement offers that were "less than ten percent of the cost that [a defendant] expended to defend suit—effectively ensured that [a plaintiff's] baseless infringement allegations remain unexposed").

vi. Such substantially equivalent assertions by another Rothschild entity that led to an attorney fee award—and therefore, on information and belief, a finding that the underlying patent infringement assertion was without merit—are relevant to whether Defendants acted in bad

PLAINTIFF'S SECOND AMENDED COMPLAINT
FOR DECLARATORY JUDGMENT
Case No. 2:23-cv-1016

17

Kilpatrick Townsend & Stockton LLP,
1420 Fifth Avenue, Suite 3700
Seattle, WA 98101
(206) 467-9600)

faith here. Indeed, Defendants engage in exactly the same type of assertions that the Federal Circuit admonished in the above-described *Rothschild* decision.

        c.    19.350.020(2)(g): "Any other factor the court determines to be relevant." As explained above, Valve sent a copy of the 2016 Global Settlement and License Agreement to the Meyler Defendants. Those defendants, a law firm and attorney bound by the Washington State Rules of Professional Conduct, should have known about the agreement and its contents based on the bare-minimum due diligence required before filing suit. The earlier-filed Meyler case, brought on behalf of Display Technologies, was voluntarily dismissed without prejudice because of that Rothschild-Valve contract. Five months later, however, Defendants are trying the same tactic again, asserting infringement of patents Valve has already licensed.

        90.    Defendants' violations of RCW 19.350 are an unfair and deceptive business practice in the conduct of trade or commerce, as declared unlawful and actionable per RCW 19.86.020. *See* RCW 19.86.093; *see also* RCW 19.350.030 (A violation of the Patent Troll Prevention Act "is an unfair or deceptive act in trade or commerce and an unfair method of competition for purposes of applying the consumer protection act, chapter 19.86 RCW.").

## IX.   PRAYER FOR RELIEF

WHEREFORE, Valve respectfully requests the following relief:

        a.    Damages, treble damages, and attorney fees pursuant to RCW 19.86.090;

        b.    A declaration that the '221 patent is invalid and unenforceable against Valve;

        c.    Preliminary and permanent injunctive relief against Defendants, and ordering Defendants and each of their officers, directors, agents, counsel, servants, employees, and all persons in active concert or participation with them to withdraw their claims and be restrained from alleging,

PLAINTIFF'S SECOND AMENDED COMPLAINT
FOR DECLARATORY JUDGMENT
Case No. 2:23-cv-1016

18

Kilpatrick Townsend & Stockton LLP,
1420 Fifth Avenue, Suite 3700
Seattle, WA 98101
(206) 467-9600)

representing, or otherwise stating that any Valve product or service infringes any patent covered by the 2016 Global Settlement and License Agreement, and further enjoining Defendants from instituting any action or proceeding against Valve alleging infringement of any claims of any of the patents covered in the 2016 Global Settlement and License Agreement;

d.    Declaring Valve as the prevailing party and this case as exceptional, and awarding Valve its reasonable attorney fees, pursuant to 35 U.S.C. § 285;

e.    Awarding Valve all damages caused by Defendants' unlawful acts, including punitive damages and pre- and post-judgment interest, as provided by law;

f.    That Defendants be ordered to pay all fees, expenses, and costs associated with this action; and

g.    Awarding such other and further relief as this Court deems just and proper.

## X.    JURY TRIAL REQUEST

Valve, pursuant to the Seventh Amendment of the United States Constitution, requests trial by jury on all issues properly heard by a jury.

DATED: January 16, 2024    Respectfully submitted,

KILPATRICK TOWNSEND & STOCKTON LLP

By:    /s/ *Dario A. Machleidt*

Dario A. Machleidt (State Bar No. 41860)
Kathleen R. Geyer (State Bar No. 55493)
Christopher P. Damitio (State Bar No. 58633)
1420 Fifth Avenue, Suite 3700
Seattle, WA 98101
Telephone: (206) 467-9600
dmachleidt@kilpatricktownsend.com
kgeyer@kilpatricktownsend.com
cdamitio@kilpatricktownsend.com

*Attorneys for Plaintiff, VALVE CORPORATION*

PLAINTIFF'S SECOND AMENDED COMPLAINT
FOR DECLARATORY JUDGMENT    19
Case No. 2:23-cv-1016

Kilpatrick Townsend & Stockton LLP,
1420 Fifth Avenue, Suite 3700
Seattle, WA 98101
(206) 467-9600)

# EXHIBIT 1

# GLOBAL SETTLEMENT AND LICENSE AGREEMENT

January 11,

This Settlement and License Agreement (this "Agreement") is made effective as of ~~August 10,~~ 2015 (the "Effective Date"), by and between, Display Technologies, LLC, a Texas limited liability company ("Display"), with a principal place of business at 1400 Preston Road, Ste. 400, Plano, TX 75093, and Leigh Rothschild ("Inventor") (Display and Inventor, collectively, are referred to as "Licensor"), on the one hand, and Valve Corporation ("Licensee"), a corporation, with a principal place of business at 10900 NE 4th St., Ste. 500, Bellevue, WA 98004, on the other hand. The term "Parties" shall refer collectively to Display, Inventor, and Licensee and each, individually as appropriate, a "Party."

WHEREAS, Display owns U.S. Patent No. 8,671,195, respectively entitled "Digital Media Communication Protocol," and has asserted that Licensee is infringing one or more claims of this patent through the sale of Licensee products;

WHEREAS Display brought suit in the United States District Court for the Eastern District of Texas, Marshall Division, Civil Action No. **2:15-cv-999** (the "Pending Litigation"), regarding U.S. Patent No. 8,671,195;

WHEREAS Licensee denies Display's allegations of infringement;

WHEREAS the Parties desire to minimize the time and expense of litigation and therefore desire to resolve the Pending Litigation on the terms set forth herein;

WHEREAS Inventor controls Display, as well as a number of other entities that have been assigned all necessary rights to license patents on which Inventor is the named inventor; and

WHEREAS the Parties desire to enter into a license agreement for patents assigned to entities controlled by Inventor, listed in Exhibit C attached to this agreement, including but not limited to the '195 patent assigned to Display;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. **Definitions**

The terms set forth below shall have the following meanings in the Agreement:

    1.1. "Affiliate" means, in relation to any Party hereto, any and all "Persons" (as hereinafter defined) now, at any time since the filing of the Pending Litigation, or in the future "Controlled" (the term "Control" and correlatives thereof shall have the meaning more particularly set forth herein) by, Controlling, or under common Control with that Party or any parent company of a Party and any subsidiary thereto.

*lmr*

CONFIDENTIAL OUTSIDE
ATTORNEYS' EYES ONLY

1.2   In the event that a Person is not an Affiliate as of the Effective Date of this Agreement, but later becomes an Affiliate through an acquisition by Licensee (an "Acquired Affiliate"), such Acquired Affiliate shall be deemed to be an Affiliate for the purposes of this Agreement upon completion of such transaction or transactions, but nothing herein shall limit or impair Licensor's rights to prosecute or maintain any claim against any Acquired Affiliate with respect to activities, events or transactions occurring prior to the time when such Person became an Acquired Affiliate. To the extent Licensee is acquired by or merges with another entity or reorganizes organizations in the future in a manner that meet the Control requirements herein, this shall be deemed a change in Control subject to Section 7.1.

1.3   Furthermore, in the event an Affiliate covered by this Agreement ceases to be an Affiliate (a "Departing Affiliate"), any rights under this Agreement shall continue to apply to such Departing Affiliate to the extent of the Departing Affiliate's pre-departure Licensed Products as an Affiliate of Licensee, but shall not extend to any products of any Third Party that acquires such Departing Affiliate or any products of any Third Party acquired by such Departing Affiliate.

1.4.   "Control" (and correlatives thereof) with respect to a Party or Person means (a) the legal, beneficial, or equitable ownership, directly or indirectly of fifty percent (50%) or more of the securities (or other equity interests) of the Person that ordinarily have voting rights in the election of the directors or equivalent managers of the Person, or (b) the possession, directly or indirectly, of the power to direct or cause the direction of management or policies of the Person, whether through the legal, beneficial, or equitable ownership or control of voting securities of the Person, appointment of more than fifty percent (50%) of the board of directors of the Person, by contract, or otherwise.

1.5.   "Licensed Patents" means the patents identified in Exhibit C and any continuations, divisionals, continuations-in-part, extensions, reissues, reexaminations, and any other patents or patent applications claiming priority to or through the patents identified in Exhibit C, and/or substitution patents and/or patent applications thereof, as well as any and all foreign counterparts of any of the foregoing. In the event that Licensor gains control or ownership of any patent listed in Exhibit D, attached to this agreement, "Licensed Patents" shall include those patents from Exhibit D which Licensor gains ownership or control over..

1.6.   "Exploit" means to, in whole or in part, directly or indirectly: own, make, have made, design, develop, author, write, use, sell, offer to sell, supply, purchase, license, offer to license, distribute, lease, import, export, operate, perform, provide, display, transmit, or otherwise transfer, practice, or dispose of, and the exercise of all other activities.

2

*lmr*

CONFIDENTIAL OUTSIDE
ATTORNEYS' EYES ONLY

1.7.  "Licensed Products" means all past, present and future machines, manufactures, compositions of matter, methods, processes, apparatuses, devices, hardware, software, applications, data, products, web sites, systems and other products and services, or any combination of one or more of the foregoing, ever Exploited by or on behalf of Licensee, which in the absence of this Agreement would infringe at least one of the claims of the Licensed Patents. "Licensed Products" shall not include the machines, manufactures, compositions of matter, methods, processes, apparatuses, devices, products, web sites, systems or services of any Third Party (any of the foregoing a "Third Party Product"), except to the extent such Third

Party Product is or was Exploited: (i) within or as any part or portion of Licensee's Licensed Product; (ii) for the direct benefit of Licensee; or (iii) by or on behalf of Licensee.

1.8.  "Person" shall mean a trust, corporation, partnership, joint venture, limited liability company, association, unincorporated organization or other legal or governmental entity.

1.9.  "Third Party" means a Person other than the Parties.

2.  **Releases and Covenants**

2.1.  **Licensor Release of Licensee.**  Subject to the payment provided under Section 5.1, Licensor irrevocably releases, acquits and forever discharges Licensee, its Affiliates, and its respective officers, directors and attorneys from any and all past, present, or future claims or liabilities of any kind and nature, at law, in equity, or otherwise, known or unknown, suspected or unsuspected, disclosed or undisclosed, arising out of or relating in any way to acts of Licensee or its Affiliates in connection with: (i) the claims and counterclaims asserted in the Pending Litigation; (ii) the Licensed Patents solely with respect to the Licensed Products; and/or (iii) the conduct of settlement negotiations occurring before the Effective Date (except for representations or obligations expressly included in this Agreement).

2.2.  **Licensor Release of Third Parties.**  Subject to the payment provided under Section 5.1, Licensor irrevocably releases, acquits and forever discharges all vendors, suppliers, manufacturers, developers, depositors, distributors, contractors, partners, hosts, direct and indirect customers, and end-users of Licensee or the Licensed Product (such third parties individually referred to herein as a "Licensee Third Party" and collectively as the "Licensee Third Parties") from any and all past, present, or future claims or liabilities of any kind and nature, at law, in equity, or otherwise, known and unknown, suspected and unsuspected, disclosed and undisclosed, arising out of or relating in any way to acts of a Licensee Third Party or the Licensee Third Parties in connection with the Licensed Patents solely with respect to the Licensed Products.  For clarity, this release shall only protect Licensee Third Parties to the extent their activities concern or relate to Licensed Products.

3

*lmr*

CONFIDENTIAL OUTSIDE
ATTORNEYS' EYES ONLY

VALVE_TH_0013844

2.3. **Licensee's Release.** Subject to the compliance by Licensor with the terms and conditions of this Agreement, Licensee irrevocably releases, acquits and forever discharges Licensor and their respective officers, directors, shareholders, members, employees, agents, consultants, experts, representatives, and attorneys from any and all claims or liabilities of any kind and nature, at law, in equity, or otherwise, known or unknown, suspected or unsuspected, disclosed or undisclosed, arising out of or relating in any way to acts of Licensor in connection with the claims and counterclaims asserted in the Pending Litigation, with respect to the Licensed Patents and with respect to the conduct of settlement negotiations occurring before the Effective Date (except for representations or obligations expressly included in this Agreement). Notwithstanding the foregoing, nothing in this Paragraph or in this Agreement shall prevent Licensee or any Licensee Third Party (other than as provided in Paragraph 3.5 hereof) from asserting that any of the Licensed Patents are invalid, not infringed or unenforceable if the Licensed Patents are asserted against Licensee or any Licensee Third Party.

3. **Grants and Covenants**

3.1. **Licensor License to Licensee.** Subject to the payment provided under Section 5.1, Licensor hereby grants to Licensee and Licensee's Affiliates a non-exclusive, non-transferable (except as provided for in Section 7.1), perpetual, irrevocable, royalty-free, fully paid-up, worldwide license, without the right to sublicense, in and to the Licensed Patents solely to Exploit the Licensed Products. Licensor hereby also grants to Licensee Third Parties, manufacturers, developers, vendors, suppliers, distributors, contractors, depositors, partners, hosts, direct or indirect customers and end-users a non-exclusive, non-transferable (except as provided for in Section 7.1), perpetual, irrevocable, royalty-free, fully paid-up, worldwide license, without the right to sublicense in and to the Licensed Patents solely to Exploit the Licensed Products. Under the terms of this Agreement, Licensee shall have no right to sublicense and further, there is no right to further sublicense by any Third Party. No royalties or additional payments of any kind shall be required in order to maintain this Agreement in force.

3.2. **Covenant Not to Sue Licensee.** Subject to the payment provided under Section 5.1, Licensor covenants not to sue Licensee or its Affiliates for actual or alleged infringement of the Licensed Patents. Licensor further covenants not to sue Licensee Third Parties and their respective direct or indirect customers, depositors, end-users, suppliers, vendors, manufacturers, hosts, partners, distributors, contractors, developers and other Third Parties for actual or alleged infringement of any Licensed Patents to the extent such actual or alleged infringement is based on activities that concern or relate to Licensed Products.

3.3. **Covenant Not to Sue Licensor.** Subject to the compliance by Licensor with the terms and conditions of this Agreement, Licensee covenants not to sue Licensor for any claims with respect to the Licensed Patents.

4

*lmr*

CONFIDENTIAL OUTSIDE
ATTORNEYS' EYES ONLY

VALVE_TH_0013845

3.4. **No Other Rights.** No rights are granted under any Patents except as expressly provided in this Agreement, whether by implication, estoppel, or otherwise. No right to grant covenants, rights, or sublicenses or to become a foundry for Third Parties is granted under this Agreement.

3.5. **Future Enforcement Activity by Licensor.** In the event that Licensor brings a claim under the Licensed Patents against any Licensee Third Party or any entity that claims that the alleged infringing conduct arises out of any communication, interaction, transaction, cooperation, or contractual obligation with or on behalf of Licensee, then upon Licensee providing written notice and sufficient written evidence to corroborate that claim, then Licensor shall within ten (10) days cause such claim to be dismissed with respect to such entity, to the extent the claim is based on conduct that is properly subject to protection from suit under Section 2.1, 2.2, 3.1 or 3.2.

4. **Dismissal of Litigation**

4.1. **Timing of Dismissal.** Within five (5) court days after the payment of the consideration to Licensor under Section 5.1 below, the Parties shall cause their respective counsel to file the stipulated motion as set forth in Exhibit A, dismissing with prejudice all claims brought by Licensor against Licensee, dismissing with prejudice all non-infringement counterclaims brought by Licensee, and dismissing without prejudice all invalidity counterclaims brought by Licensee in the Pending Litigation, to the extent any such claims or counter claims have been raised in litigation between the Parties at that time. The Parties shall promptly proceed with any and all additional procedures needed to effect the above dismissal. If for any reason (except for Licensee's failure to make the payment under Section 5.1), Licensor or its counsel refuses to file the motion as set forth in Exhibit A, Licensee shall have the right to demand Licensor immediately refund in full the Consideration to Licensee.

4.2. **Costs.** The Parties agree that they shall bear their own costs and attorneys' fees relating to the Pending Litigation and to the negotiation of this Agreement.

4.3. **Dismissal of Licensee Third Parties**. To the extent Licensor has any pending lawsuits against Licensee Third Parties related to the Licensed Products and the Licensed Patents, Licensor will undertake to dismiss with prejudice all claims against Licensee Third Parties related to the Licensed Products within 5 days after Licensor's receipt of the payment of the "Consideration" (as hereinafter defined), provided Licensee provides written notice to Licensor of the lawsuits involving such Licensee Third Parties.

5. **Consideration**

5.1. **Payment.** In consideration of the licenses, releases, and covenants granted by Licensor and the dismissal by Licensor of the Pending Litigation, Licensee agrees

5

*lmr*

CONFIDENTIAL OUTSIDE
ATTORNEYS' EYES ONLY

VALVE_TH_0013846

to pay to Licensor ███████ Redacted for Confidentiality ███████ (the "Consideration"). The Consideration shall be paid within five (5) days of the Effective Date. Such payment shall be by electronic or wire transfer to an account specified by Licensor and attached to this Agreement as Exhibit B. No other payments are required by this Agreement. Notwithstanding anything contained herein to the contrary, this Agreement shall not be effective until the Consideration has been received by Licensor. The Parties hereby agree that this is a settlement and no representation is made by Licensor that the foregoing Consideration represented a reasonable royalty from the infringement alleged in the Litigation. The Consideration paid to Licensor under this Agreement shall be nonrefundable, including in the event of a finding of invalidity, unenforceability, or non-patentability of the Licensed Patents.

5.2.    **Taxes.** Licensor shall bear all U.S. taxes imposed with respect to payments made to it hereunder. For clarity, this does not include any other taxes, charges, or fees, for example, non-U.S. taxes or non-U.S. tax withholdings.

5.3.    **No Withholding.** Licensee's payment of the Consideration hereunder shall be made free and clear of any taxes, withholding taxes, assets, duties, permits, tariffs, fees and other charges of any kind.

6.    <u>Term and Termination</u>

6.1.    **Term.** The term of this Agreement shall be from the Effective Date until the expiration of the last-to-expire Licensed Patents, unless earlier terminated as allowed by this Agreement, provided that the licenses, releases, and covenants granted by Licensor herein shall survive in perpetuity.

6.2.    **Agreement Obligations Not Released.** Notwithstanding anything to the contrary herein, the Parties reserve all rights and remedies, including damages and equitable relief, for breach of this Agreement by the other Party and nothing herein releases any Party from its respective obligations under this Agreement or prevents any Party from enforcing the terms and conditions of this Agreement against the other.

7.    <u>Assignment and Change of Control</u>

7.1.    **Assignment by Licensee.** Licensee may assign its rights under this Agreement without prior written consent of Licensor as follows: (A) In the event of a change of Control of Licensee, this Agreement shall continue to benefit and obligate Licensee or the successor entity and the licenses granted in Subsection 3.1 may be assigned to such successor entity, provided that (i) such licenses will extend only to the Licensed Products and that part of the business relating to the Licensed Products prior to such change of Control and will not extend to any machines, manufactures, compositions of matter, methods, processes, apparatuses, devices,

*lmr*

CONFIDENTIAL OUTSIDE
ATTORNEYS' EYES ONLY

VALVE_TH_0013847

products, web sites, systems of the successor or acquiring entity (other than the Licensed Products (or reasonable extensions of the foregoing and whether rebranded or not) of the Licensee's business that existed prior to the change of Control); and (ii) the obligations of Licensee are similarly assigned. (B) Licensee may assign its rights under this Agreement, in whole or in part, as part of a sale, transfer, or spin-off of a substantial portion of Licensee or its Affiliate's business, provided that any assignment of rights under this Agreement shall only extend to the Licensed Products of Licensee and/or of its Affiliates immediately prior to the date of the sale, transfer or spin-off and will not extend to any other products, services or activities prior to, on or after the effective date of the assignment except with respect to the same type and scope of Licensed Products that were conducted immediately prior to the sale, transfer, or spin-off. All rights under this Agreement shall continue to apply to a Departing Affiliate to the extent of the Departing Affiliate's pre-departure Licensed Products as an Affiliate of Valve, but shall not extend to any activities of any Third Party that acquires such Departing Affiliate or any activities of any Third Party acquired by that Departing Affiliate.

Any assignment or transfer of licenses in violation of this Subsection 7.1 shall be null and void, but only from such time as the violation occurs. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the Parties and their permitted successors and assigns. Except as set forth in this Section 7.1, this Agreement may not be assigned by Licensee without the prior written permission of Licensor, and any attempt to assign without such permission will be void.

7.2. **Assignment by Licensor.** Licensor may not assign, or exclusively license, any of the Licensed Patents without such assignee or licensee agreeing to be bound by the obligations of Licensor hereunder as if it were a party hereto, and any assignment or exclusive license made in violation of this provision shall be void.

7.3. **Notice of Assignments.** To the extent either Party makes an assignment, whether complete or partial, of its rights under this Agreement where permitted by the express terms of the Agreement, that Party shall provide written notice to the nonassigning Party. In the event of any change of control of Licensee, a public announcement of such change of control shall be deemed to constitute written notice of assignment for purposes of this section.

7

*lmr*

CONFIDENTIAL OUTSIDE
ATTORNEYS' EYES ONLY

VALVE_TH_0013848

8. **Notices**

8.1. Notices and other communications regarding or under this Agreement shall be sent (i) by overnight courier or by registered or certified mail and (ii) if available, electronic mail to the following addresses:

1.1.1. Notices to Licensor shall be sent to Licensor's agents at:

Ni Wang & Massand, PLLC
8140 Walnut Hill Lane
Suite 310
Dallas, Texas 75231
nmassand@nilawfirm.com

.................................................................

1.1.2. Notices to Licensee shall be sent to Licensee at:

Valve Corporation
c/o General Counsel
10900 NE 4th Street
Suite 500
Bellevue, WA 98004

With a copy to:

Ed Cavazos
Pillsbury Winthrop Shaw Pittman LLP
111 Congress Ave., Suite 400
Austin, Texas 78701
ed.cavazos@pillsburylaw.com

8.2. A Party may change the above addresses for notices relating to this Agreement in a written notice to the other Party complying as to delivery with the terms of Section 8.1. All such notices, requests, demands and other communications shall be effective, if by mail or overnight courier, when delivered or if not delivered due to refusal or failure to advise the other Party of a change of address, five (5) days after depositing such notice in the U.S. mail or one (1) day after depositing such notice with an overnight courier.

9. **Representations, Warranties and Disclaimers**

9.1. Each Party and each person signing this Agreement on behalf of a Party represents and warrants to the other that it has the full right and power to enter

8

*lmr*

CONFIDENTIAL OUTSIDE
ATTORNEYS' EYES ONLY

VALVE_TH_0013849

into this Agreement, and the person executing this Agreement has the full right and authority to enter into this Agreement on behalf of such Party and the full right and authority to bind such Party to the terms and obligations of this Agreement.

9.2.    Licensor represents and warrants that as of the Effective Date (a) Licensor is the sole owner of the entire right, title and interest in and to the Licensed Patents, including all rights to enforce and sue for past damages, as reflected by the "Assignee" entities listed in Exhibit C; and (b) Licensor has the right and authority to grant the rights, licenses and releases hereunder on behalf of the entities listed in Exhibit C.

9.3.    Other than that which is required of Licensee by Court Order or rule of law, Licensee represents and warrants that it will not contest or assist in contesting the validity or enforceability of the Licensed Patents and will so instruct its counsel and consultants retained for this case other than those retained in conjunction with co-defendants not to contest or assist in contesting the validity or enforceability of the Licensed Patents on Licensee's behalf.  If Licensee (or its counsel on Licensee's behalf) intentionally or knowingly contests or assists in the contesting of the validity or enforceability of the Licensed Patents, Licensor will have the right to unilaterally terminate this Agreement.  For the avoidance of doubt, no production or response by Licensee to a subpoena or other order of a court of competent jurisdiction shall be considered contesting or assisting with a contest under this Section.  Nothing in this section shall be construed so as to restrict any counsel, including Licensee's counsel in the Pending Litigation, from taking any action whatsoever (including challenging the validity and enforceability of the Licensed Patents in any judicial or administrative forum) on behalf of their clients who are not parties to this Agreement.  Nothing in this Paragraph or in this Agreement shall prevent Licensee from asserting that any of the Licensed Patents are invalid, not infringed or unenforceable if the Licensed Patents are asserted against Licensee or its Licensee Third Parties.

9.4.    EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT, NEITHER LICENSOR NOR LICENSEE MAKES ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED, OR ASSUMES ANY RESPONSIBILITIES WHATSOEVER WITH RESPECT TO THE COMMERCIAL SUCCESS, USE, SALE, OR OTHER DISPOSITION BY OR FOR ANY OTHER PARTY (OR ITS SUBSIDIARIES) OR THEIR DISTRIBUTORS, USERS, OTHER CUSTOMERS, OR SUPPLIERS OF PRODUCTS INCORPORATING OR MADE BY THE USE OF INVENTIONS LICENSED HEREIN.  LICENSOR DOES NOT CONVEY ANY RIGHT OR LICENSE (EXCEPT TO THE EXTENT NECESSARY TO EXERCISE THE RIGHTS EXPRESSLY GRANTED HEREIN) BY IMPLICATION,

9

*lmr*

CONFIDENTIAL OUTSIDE
ATTORNEYS' EYES ONLY

VALVE_TH_0013850

ESTOPPEL, OR OTHERWISE, EXCEPT AS EXPRESSLY GRANTED HEREIN.

9.5. In no event shall Licensor be liable for any special, punitive or exemplary damages or for loss of profits or revenue, or any indirect, consequential or incidental damages arising out of, or in connection with, this Agreement and the Licensed Products. Further, in no event shall Licensor be found liable for damages to any party for any amount that exceeds the aggregate total amount of Consideration paid hereunder with respect to this Agreement and the Licensed Products. In no event shall Licensee be liable for any special, punitive or exemplary damages or for loss of profits or revenue, or any indirect, consequential or incidental damages arising out of, or in connection with, this Agreement.

## 10. **Confidentiality, Publicity Material and Marketing**

10.1. Nothing in this Agreement shall confer upon any Party any right to include in advertising, packaging or other commercial activities, any reference to the other Parties in any manner whatsoever.

10.2. Each Party agrees not to disclose the terms of this Agreement to any third party without the prior written consent of the other Party, which may be withheld in such parties sole and absolute discretion. This obligation is subject to the following exceptions:

1.1.1. disclosure is permissible if required by government or court order, including litigation document requests and SEC (or equivalent) reporting requirements, but only to the extent so required, provided that such disclosure is subject to confidential treatment to the fullest extent allowed by law;

1.1.2. disclosure is permissible if otherwise required by law or required during the course of litigation (e.g., subpoena, discovery request or equivalent), but only to the extent so required and provided that such disclosure does not affect the confidential nature of such information;

1.1.3. disclosure is permissible to the extent the information becomes publicly available by judicial order or action;

1.1.4. disclosure is permissible if required to enforce rights under this Agreement; and

1.1.5. each Party may disclose this Agreement or its contents to the extent reasonably necessary, on a confidential basis, to its Affiliates, accountants, attorneys, auditors, and financial advisors or those of any third party in connection with a financing or corporate transaction.

10

*lmr*

CONFIDENTIAL OUTSIDE
ATTORNEYS' EYES ONLY

1.1.6. Licensee may disclose this Agreement to all Licensee Third Parties covered by the releases, grants, and covenants provided in Sections 2 and 3 above.

1.1.7. Licensor may disclose the fact that a settlement and/or license agreement has been reached with Licensee in connection with any other litigation or enforcement efforts by Licensor with respect to the Licensed Patents. The terms of the settlement or license shall remain confidential pursuant to the terms hereof.

## 11. **General Terms**

11.1. The construction, validity and performance of the Agreement shall be governed in all respects (without regard to conflicts of law provisions) by the law of the State of Texas, United States of America, as such law applies to contracts signed and fully performed in the State of Texas. The Parties hereby submit to the jurisdiction of, and waive any venue objections against, the State and Federal courts in Texas.

11.2. Nothing in the Agreement is to be construed as requiring the commission of any act contrary to law. Wherever there is any conflict between any provision of the Agreement and any statute, law or ordinance, or a treaty and its valid regulations, the statute, law, ordinance, or treaty and its valid regulations shall prevail. In such event the provisions of the Agreement shall be curtailed and limited only to the extent necessary to bring them within the legal requirements, and such provisions, so curtailed and limited, together with all other provisions of the Agreement shall continue in full force and effect.

11.3. All rights granted under the covenants not to assert, releases, discharges and other rights granted under or pursuant to this Agreement are, and shall otherwise be deemed to be, for purposes of Section 365(n) of Title 11, U.S. Code (the "Bankruptcy Code"), licenses and rights to "intellectual property" as defined under Section 101 of the Bankruptcy Code. The Parties agree that each Party shall retain and may fully exercise and enjoy all rights and elections available to them under the Bankruptcy Code and other applicable laws and regulations.

11.4. This Agreement will not be binding upon the Parties until it has been signed herein below by or on behalf of each Party, in which event, it shall be effective as of the Effective Date. No amendment or modification hereof shall be valid or binding upon the Parties unless made in writing and signed as aforesaid.

11.5. The failure of a Party to enforce any provision of this Agreement shall not prevent the subsequent enforcement of such provision. No waiver of any provision of this Agreement shall be deemed or shall constitute a waiver of any other provision, whether or not similar, nor shall any waiver constitute a continuing

11

*lmr*

CONFIDENTIAL OUTSIDE
ATTORNEYS' EYES ONLY

waiver unless expressly stated in writing by the party making the waiver. No waiver of any provision shall be binding in any event unless executed in writing by the party making the waiver.

11.6. The headings of the several Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning and interpretation of this Agreement.

11.7. This Agreement embodies the entire understanding of the Parties and supersedes all previous communications, representations or understandings, either oral or written, between the Parties relating to the subject matter hereof.

11.8. Each Party shall bear its own costs, expenses and attorneys' fees incurred in connection with the making of this Agreement, and its performance under this Agreement. Each Party expressly waives any claim of costs and attorneys' fees from or against the other Party, including, without limitation, any attorneys' fees or costs that may already have been awarded in any action.

11.9. The language of this Agreement has been approved by counsel for each Party, and neither Party (nor their respective counsel) shall be deemed to be the draftsman of this Agreement. Thus, any rule of construction to the effect that ambiguities are to be resolved against the drafting Party will not be applied in the interpretation of this Agreement. The words "include" and "including" and variations thereof, will not be deemed to be terms of limitation in this Agreement, but rather will be deemed to be followed by the words "without limitation." The headings in this Agreement are for convenience and organization only, and not intended to constitute the substance of this Agreement and will not be referred to in connection with the construction or interpretation of this Agreement.

11.10. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute but one and the same instrument. Such counterparts may be exchanged by fax, or scanned and exchanged by electronic mail, confirmed with printed copy, but shall be effective upon receipt of fax/electronic mail as applicable. The Parties agree that facsimile or scanned copies of signatures shall be deemed originals for all purposes hereof and that either Party may produce such copies, without the need to produce original signatures, to prove the existence of this Agreement in any proceeding brought hereunder.

11.11. Marking. Licensee asserts that it has not infringed any claim of the Licensed Patents and that it is not currently infringing any claim of the Licensed Patents. Licensee further acknowledges that, before entering into this Agreement, Licensee was not authorized to make, have made, sell, offer for sale, or import into the United States any product that infringed any claim of the Licensed Patents. From the Effective Date forward, for products that are not Licensed

12

*lmr*

CONFIDENTIAL OUTSIDE
ATTORNEYS' EYES ONLY

VALVE_TH_0013853

Products, Licensee will have no products that must be marked with notice of the Licensed Patents under 35 U.S.C. § 287.

13

*lmr*

CONFIDENTIAL OUTSIDE
ATTORNEYS' EYES ONLY

VALVE_TH_0013854

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed with intent to be bound as of the Effective Date.

**Display Technologies, LLC**

By _____

Name: Leigh M. Rothschild

Title: Managing Director

Date: 01/11/2016

**Valve Corporation**

By _____

Name: Scott Lynch

Title: COO

Date: 1/14/2016

**Leigh Rothschild (on his own and on behalf of all entities listed as "Assignee" in Exhibit C)**

By _____

Name: Leigh M. Rothschild

Title: Managing Director

Date: 01/11/2016

THIS AGREEMENT DOES NOT BIND OR OBLIGATE EITHER PARTY IN ANY MANNER UNLESS DULY EXECUTED BY AUTHORIZED REPRESENTATIVES OF BOTH PARTIES

14

CONFIDENTIAL OUTSIDE
ATTORNEYS' EYES ONLY

VALVE_TH_0013855

**EXHIBIT A**

**THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| **DISPLAY TECHNOLOGIES, LLC** | |
| Plaintiff, | **Civil Action No. 2:15-cv-999** |
| v. | |
| **VALVE CORPORATION,** | **JURY TRIAL DEMANDED** |
| Defendant. | |

## MOTION TO DISMISS

Under Federal Rule of Civil Procedure 41(a), Display Technologies, LLC ("Display") dismisses its claims against Valve Corporation ("Valve") with prejudice against Valve and each party bears its own attorneys' fees and costs.

15

*lmr*

CONFIDENTIAL OUTSIDE
ATTORNEYS' EYES ONLY

# THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | | |
|---|---|---|
| **DISPLAY TECHNOLOGIES, LLC** | | |
| | Plaintiff, | **Civil Action No. 2:15-cv-999** |
| v. | | |
| **VALVE CORPORATION,** | | **JURY TRIAL DEMANDED** |
| | Defendant. | |

## ORDER

In light of the Motion to Dismiss filed by Plaintiff Display Technologies, LLC ("Display"), the Court HEREBY ORDERS as follows:

      1.    Display's claims against Valve Corporation are hereby dismissed WITH PREJUDICE

      2.    Display and Valve Corporation shall each bear their own attorneys' fees and costs incurred in connection with this action.

16

*lmr*

CONFIDENTIAL OUTSIDE
ATTORNEYS' EYES ONLY

VALVE_TH_0013857

**EXHIBIT B**
**Wire Instructions**

| | |
|---|---|
| Account Name: | Ni Law Firm, PLLC IOLTA Account |
| Reference: | Display Technologies, LLC |
| Account No.: | 413981346 |
| Routing No.: | 111000614 |
| SWIFT Code: | CHASUS33 |
| Name of Bank: | JPMorgan Chase Bank, N.A. |
| Bank Address: | 3610 McKinney Ave., Dallas, TX 75204 |
| Bank Phone No.: | 214-443-1555 |

17

*lmr*

CONFIDENTIAL OUTSIDE
ATTORNEYS' EYES ONLY

VALVE_TH_0013858

**Exhibit C**
**Licensed Patents**

| No. | Patent Number | Title | Assignee |
|---|---|---|---|
| 1 | 9054860 | Digital verified identification system and method | SRR Patent Holdings, LLC; |
| 2 | 8897833 | Wireless image distribution system and method | Leigh Rothschild |
| 3 | 8671195 | Digital media communication protocol | Display Technologies, LLC; |
| 4 | 8594722 | Wireless image distribution system and method | Rothschild Storage Retrieval Innovations, LLC; |
| 5 | 8437797 | Wireless image distribution system and method | Rothschild Storage Retrieval Innovations, LLC; |
| 6 | 8346920 | Managing network resource requests | SRR Patent Holdings, LLC; |
| 7 | 8307089 | System and method for storing broadcast content in a cloud-based computing environment | Ariel Inventions, LLC; |
| 8 | 8219590 | Media validation system | Rothschild Trust Holdings, L.L.C.; |
| 9 | 8204437 | Wireless image distribution system and method | Rothschild Storage Retrieval Innovations, LLC; |
| 10 | 7979434 | System and method for storing and retrieving digital content with physical file systems | SRR Patent Holdings, LLC; |
| 11 | 6101534 | Interactive, remote, computer interface system | Rothschild Digital Media LLC; |

18

*lmr*

CONFIDENTIAL OUTSIDE ATTORNEYS' EYES ONLY

VALVE_TH_0013859

| 12 | 8856221 | System and method for storing broadcast content in a cloud-based computing environment | Ariel Inventions, LLC; |
| 13 | 9053498 | Systems and methods for indicating the existence of accessible information pertaining to articles of commerce | Reagan Inventions, LLC; |
| 14 | 8799088 | System and method for verifying user identity information in financial transactions | SRR Patent Holdings, LLC; |
| 15 | 7698164 | Method and system for providing a payment incentive for distributing digital files over a network | Matthew Inventions, LLC; |
| 16 | 8832542 | System and method of embedding symbology in alphabetic letters and then linking the letters to a site or sites on the global computer network | Leigh Rothschild |
| 17 | 8469270 | Systems and methods for indicating the existence of accessible information pertaining to articles of commerce | Reagan Inventions, LLC |
| 18 | 8151180 | System and method of embedding symbology in alphabetic letters and then linking the letters to a site or sites on the global computer network | Reagan Inventions, LLC |
| 19 | 8799263 | Systems, devices, and methods for providing multidimensional search results | Ariel Inventions, LLC |
| 20 | 8370141 | Device, system and method for enabling speech recognition on a portable data device | Reagan Inventions, LLC |

*lmr*

CONFIDENTIAL OUTSIDE
ATTORNEYS' EYES ONLY

VALVE_TH_0013860

**Exhibit D**
**Patents Licensed if Licensor Gains Ownership or Control**

| No. | Patent Number | Title | Assignee |
|---|---|---|---|
| 1 | 8838693 | Multi-user media delivery system for synchronizing content on multiple media players | Portulim Foundation LLC; |
| 2 | 8504652 | Method and system for selectively supplying media content to a user and media storage device for use therein | Portulim Foundation LLC; |
| 3 | 8473514 | Media validation system | Schust Development LLC; |
| 4 | 8396931 | Interactive, multi-user media delivery system | Portulim Foundation LLC; |
| 5 | 8122466 | System and method for updating digital media content | Portulim Foundation LLC; |
| 6 | 8069164 | Media validation system | Schust Development LLC; |
| 7 | 8046813 | Method of enhancing media content and a media enhancement system | Portulim Foundation LLC; |
| 8 | 7711774 | Interactive, multi-user media delivery system | Portulim Foundation LLC; |
| 9 | 7631000 | Media validation system | Schust Development LLC; |
| 10 | 7318061 | Media validation and registration system | Schust Development LLC; |
| 11 | 8909729 | System and method for sharing digital media content | No apparent assignment; |
| 12 | 7503059 | Method of enhancing media content and a media enhancement system | Portulim Foundation LLC; |

20

*lmr*

CONFIDENTIAL OUTSIDE ATTORNEYS' EYES ONLY

VALVE_TH_0013861

| 13 | 6952697 | Media validation system | Schust Development LLC |
|----|---------|--------------------------|------------------------|
| 14 | 6766363 | System and method of linking items in audio, visual, and printed media to related information stored on an electronic network using a mobile device | Neomedia Technologies, Inc. |
| 15 | 6430554 | Interactive system for investigating products on a network | Neomedia Technologies, Inc. |

*lmr*

21

CONFIDENTIAL OUTSIDE
ATTORNEYS' EYES ONLY

VALVE_TH_0013862

# EXHIBIT 2

SUBSCRIBE                    SIGN IN

*POLICY —*

# Stupid Patent of the Month: "Internet drink mixer" vs. everyone

Leigh Rothschild urges his fellow inventors to rise up and stop patent reform.

JOE MULLIN - 9/1/2015, 12:25 PM



CBS

"System and method for creating a personalized consumer product."

It's that time of the month again: the Electronic Frontier Foundation has selected a winner for its "Stupid Patent of the Month" contest.

Patent-holding company Rothschild Connected Devices Innovations (RCDI) owns US Patent No. 8,788,090, which was granted in 2014 and describes a system where a "remote server" "transmits" a "product preference" via a "communication module." Using those broad claims, RCDI has sued more than 20 companies for making things that connect to the Internet. The company sued ADT (PDF) over its Pulse product that allows for things like adjusting a thermostat.



Join Ars Technica and

## Get Our Best Tech Stories

DELIVERED STRAIGHT TO YOUR INBOX.

Email address

SIGN ME UP

By signing up, you agree to our user agreement (including the class action waiver and arbitration provisions), our privacy policy and cookie statement, and to receive marketing and account-related emails from Ars Technica. You can unsubscribe at any time.

ADVERTISING



The patent relates to an application filed back in 2006 that essentially describes an Internet drink mixer. A consumer can customize products by connecting to a server on "the global computer network, e.g., the Internet," which can then "provide product preferences of a user to a product or a mixing device, e.g., a product or beverage dispenser."

RCDI's complaint against Toshiba (PDF) seeks royalty payments over remote operation of cameras. The patent troll's lawsuit against Sharp (PDF) says that sending scanned documents to a mobile device infringes its patent. Given interpretations like that, it's hard to imagine what part of the "Internet of things" doesn't owe inventor Leigh Rothschild money.

"There will be no prize for guessing where RCDI has filed all of its litigation: the Eastern District of Texas," writes EFF patent attorney Daniel Nazer. "Its unique, plaintiff-friendly rules make it easier for trolls to use the cost of defense to extort settlements, even when the underlying case is weak."

Advertisement

Of course, product customization, online or not, wasn't even close to new. "Even in 2006, this was a spectacularly mundane idea," writes Nazer. "It just connects a product mixer to the Internet."

## Save the inventor

The patent was filed by Leigh Rothschild, a Florida man who appears to own several other holding companies at the same Plano address, including Rothschild Digital Media Innovations and Rothschild Location Technologies, which sues over GPS apps.

Rothschild's attempts to get dozens of payouts for his Internet drink mixer idea may look problematic to EFF, but to Intellectual Ventures (IV), the largest patent-holding company, Rothschild's inventions suggest another narrative. IV unabashedly promotes Rothschild in one of its "inventor spotlight" articles.

The article doesn't mention the nearly 100 lawsuits filed by his shell companies. It does mention his 60+ patents, portraying him as a kind of idea man who can't be bothered with the day-to-day of operating a business.

"I'm not a 'runner,' I'm an inventor," Rothschild says. He sold two companies so he could spend "more time in invention mode." The article goes on to suggest that inventors like Rothschild are in danger from "big companies" seeking to change patent laws:

> Big companies that want intellectual property (IP) don't always make licensing deals with individual inventors...
>
> Rothschild suggests that more inventors need to reach out to members of Congress and help them understand what inventors are up against. "They don't have the individual inventor perspective. Our voices are being drowned out by far bigger lobbying contingents... Would you take away the right to patent inventions that have been the core of American innovation, such as the light bulb or the telephone?"
>
> Rothschild still remembers when Intellectual Ventures (IV) called him: "An inventor can call himself lucky when a call like that comes in."

The inventor says he's looking forward to working with IV for decades to come. "There's an art to packaging a patent, and Intellectual Ventures is a one-stop-shop when it comes to monetizing IP," he says.

READER COMMENTS        71

---

**JOE MULLIN**

Joe has covered the intersection of law and technology, including the world's biggest copyright and patent battles, since 2007.

Advertisement



# EXHIBIT 3

# Gadgets, Gigabytes & Goodwill Blog

A Law Blog on Issues Surrounding the Protection and Promotion of Intangible Assets

## NPE Showcase – Leigh Rothschild



By Patrick Muffo on May 11, 2023

Most nonpracticing entities are private firms owned by patent attorneys, investors, or a combination of the two. In other cases, NPEs do everything they can to obscure the identify

of the true owner. And in virtually all cases, NPEs purchase the asserted patents from another company seeking to divest assets for cash.

Leigh Rothschild is a bit different. Mr. Rothschild is typically both the inventor of the asserted patent and the owner of the company asserting the patents. Some have called him a modern day Thomas Edison given the hundreds of patents for which he is a listed owner—ranging from an **internet connected drink mixer** to a **telecommunications method for transferring media content**. Others have accused him of being a "patent troll" based on the broad interpretation of his patents and his litigious enforcement activity.

A fair assessment likely places Mr. Rothschild somewhere in between. His entities have filed a whopping 1,249 patent infringement lawsuits with 23 of those pending. This certainly qualifies as a high volume patent troll. And Rothschild has been hit with fee awards for filing objectively baseless lawsuits against defendants who clearly did not infringe his patents. This suggests at least some of his cases are quite weak. All troll-like behavior, but from an inventor who is *creating* the patents rather than *mining* for them.

Rothschild is likely better described as someone who is capable of slipping a patent application by the Patent Office in very broad terms, then asserting it against technology that is completely different than the invention in the patent. Take the drink mixer invention above. Mr. Rothschild argued that invention was broad enough to cover the concept of remote configuration. Here is claim 1 of that patent:

> 1. A system for customizing a product according to a user's preferences comprising: a remote server including a database configured to store a product preference of a predetermined product for at least one user; and
>
> a first communication module within the product and in communication with the remote server;
>
> wherein the remote server is configured to receive the identity of the predetermined product and the identity of the at least one user, retrieve the product preference from the database based on the identity of the predetermined product and the identity of the least one user and transmit the product preference to the first communication module.

The patent examiner was clearly fooled by the invention of the application (a remote drink mixer) and did not mean to allow a claim that was so broad. But that's the game – and Rothschild plays it well.

Fast forward to today and you'll find Rothschild filing cases in a time when IP Edge has effectively halted its patent enforcement activities. Of course, IP Edge reduced their filings in response to Judge Connolly forcing the disclosure of the owners of IP Edge entities. Rothschild has no issue offering up his ownership and, in fact, enjoys the perception of the Thomas Edison-like status that comes with it.



Copyright © 2023, Seyfarth Shaw LLP. All Rights Reserved.

# EXHIBIT 4



JUNE 6, 2017                                                                                                    eff.org



# Federal Circuit Hits Stupid Patent Owner With Fee Award

Patent litigation abuse thrives when patent trolls can force defendants into making a hard choice: pay the troll (even though the claim is absurd) or pay even more to your lawyers. This week, the Federal Circuit issued an encouraging ruling that will make it harder to use this gambit. Overturning a contrary decision by the patent-friendly Eastern District of Texas, the appellate court required a notorious patent troll practicing this model to pay the defendant's attorney's fees. The lower court had given the troll a pass because it dismissed its case early (which would give impunity to any troll that runs away when the defendant fights back). This week's decision is an important win for victims of abusive litigation.

The patent troll in question is Rothschild Connected Devices Innovations LLC (RCDI). RCDI's patent on an Internet-connected drink mixer is so stupid we awarded it our August 2015 Stupid Patent of the Month. As we explained in that post, RCDI's patent not only claimed an obvious idea, but had been expanded so broadly that it effectively covered any kind of remote updating over the Internet.

Armed with an absurdly broad patent, RDCI began suing dozens of companies ranging from ADT to Whirlpool. It effectively claimed to own the entire Internet of Things. For example, its complaint against ADT claimed that a system that



FIG. 1

allows customers to "remotely customize the operation" of a "thermostat" infringed RCDI's patent. Many of these cases settled quickly for nuisance amounts. When defendants fought back, RCDI simply dismissed its claims.

Some defendants were able to deter RCDI by filing a motion arguing that its patent is invalid under *Alice v. CLS Bank* (which holds that abstract ideas do not become patent eligible by being performed with generic computers). If it weren't for the *Alice* decision, it would have been far more difficult for defendants to avoid lengthy and expensive discovery and that would have created intense settlement pressure. This case is a good example of why Congress should leave the *Alice* decision alone.

After RCDI dismissed its case against ADS Security, ADS kept fighting and demanded attorney's fees. Magistrate Judge Payne rejected the request because RCDI had dismissed its case early, after ADS sent a letter explaining that RCDI's claims were frivolous. As the Federal Circuit explained, Judge Payne's decision conflated Rule 11 (which gives parties the chance to withdraw) with Section 285 of the Patent Act (which allows for fee awards in exceptional cases). The Federal Circuit also noted that the district court had failed to give enough weight to RCDI's pattern of vexatious litigation.

The Federal Circuit's recent ruling is not the only challenge RCDI faces. International tech company Garmin, Inc. is also fighting back and seeking fees. Garmin's most recent filing outlines a disturbing pattern of misconduct, including:

- RDCI's principal misrepresented his residency in a signed form submitted to the Texas Secretary of State.
- RDCI's real office is in Florida but it claimed that a virtual office in Texas was its "principle place of business" and its only address.
- RDCI argued that a motion under Section 101 could not be decided until formal claim construction then later argued no claim terms needed construction.

Garmin supports each of these allegations with documentary evidence. In opposing Garmin's fee motion, RCDI had been relying heavily on the now–overturned decision denying ADS's fees. Hopefully, the Federal Circuit's new guidance will help the Eastern District of Texas reach a fair result this time.

While this week's decision is encouraging, more reform is needed. The decision does nothing to prevent the Patent Office from issuing more stupid software patents to fuel patent trolling. Patent trolls are still desperately trying to get their cases into the Eastern District of Texas, even after the Supreme Court's decision in the *TC Heartland* case. Even if trolls have to leave Texas, that doesn't prevent them from shaking down defendants in other districts.

The principal and supposed inventor behind RCDI, Leigh Rothschild, was once featured by Intellectual Ventures in an Inventor Spotlight blog post where he argued against patent reform. But RCDI is not a poster child for the patent system. It is a poster child for patent litigation abuse. EFF agrees with Intellectual Ventures on one thing: the absurd patents and abusive litigation conduct of trolls like RCDI should be at the center of any debate about patent reform.

# JOIN EFF LISTS

## Discover more.

Email updates on news, actions, events in your area, and more.

Email Address

Postal Code (optional)

Anti-spam question: Enter the three-letter abbreviation for Electronic Frontier Foundation:

**SUBMIT**

# EXHIBIT 5

| | |
|---|---|
| **From:** | |
| **To:** | Chris Schenck; |
| **Subject:** | FW: Continued Business with Patent Asset Management (Rothschild) |
| **Date:** | Tuesday, March 15, 2022 3:46:46 PM |

Recent attempt to reengage from the Patent Asset Management sales guy.

I haven't looked at any attachment on LinkedIn, just this email.

---

**From:** ▇▇▇▇▇▇ ▇▇▇▇▇▇ @hotmail.com>
**Sent:** Tuesday, March 15, 2022 9:57 AM
**To:** ▇▇▇▇▇▇▇▇▇ @valvesoftware.com>
**Subject:** Fwd: Continued Business with Patent Asset Management (Rothschild)

Begin forwarded message:

> **From:** Daniel Falcucci <messages-noreply@linkedin.com>
> **Date:** March 15, 2022 at 8:53:49 AM PDT
> **To:** ▇▇▇▇▇▇▇ <▇▇▇▇▇▇▇ @hotmail.com>
> **Subject: Continued Business with Patent Asset Management (Rothschild)**



Good Morning ▇▇▇

My name is Daniel Falcucci, and I'm the Director of Business Development at Patent Asset Management. Our company is headed by Leigh Rothschild, a prolific and well known inventor, and we focus on enforcing the rights of U.S. patent holders. In 2015, our company entered into an Agreement with Valve Corporation, titled "Global Settlement and License Agreement."

We were happy to reach an agreement then, and I'd like to propose an opportunity to enter into a new agreement with PAM. Is this something you'd be interested in discussing? Our company has acquired a number of valuable patent assets in the past few years, and I'd be glad to present a list of our current inventory for Valve's review.

Attached, please find an introductory proposal and inventory catalog. Please let me know if you or someone at Valve would like to setup a time to met and talk more.



Best Regards,
Daniel Falcucci Marquardt

**Yes, interested…**    No thanks…    Reply

View Daniel's LinkedIn profile

Unsubscribe   |   Help

This email was intended for ▇▇▇▇▇ (Attorney at Valve Corporation). Learn why
we included this.

© 2022 LinkedIn Corporation, 1000 West Maude Avenue, Sunnyvale, CA 94085.
LinkedIn and the LinkedIn logo are registered trademarks of LinkedIn.

# EXHIBIT 6



Valve Corporation    valvesoftware.com
10400 NE 4th Street, Suite 1400 vox 425 889 9842
Bellevue, WA 98004   fax 425 827 4843

Samuel M. Meyler
Meyler Legal, PLLC
1700 Westlake Ave. N., Ste. 200
Seattle, Washington 98109

Via email to samuel@meylerlegal.com with a copy to: Jay Johnson at Kizzia Johnson PLLC via email to jay@kjpllc.com and akearney@kjpllc.com

Attorney Meyler,

This concerns the lawsuit brought by your client Social Positioning Input Systems, LLC ("Social Input") against Valve Corporation ("Valve"). The complaint in that matter, dated September 29, 2022 was signed by you as counsel for Social Input. Please be advised that Valve firmly believes that there is no sufficient factual or legal basis, formed after reasonable inquiry by you, for the claims against Valve for alleged infringement of U.S. Pat. No. 9,261,365 ("the '365 Patent"). If you continue to press these claims against Valve, Valve will seek sanctions and recovery of all attorney's fees and expenses Valve incurs in defending against the suit under Fed. R. Civ. P. 11(c).

We assume at the time you signed the complaint you were aware, or could have been aware on reasonable inquiry, of the history between Valve and your ultimate client, inventor Leigh Rothschild ("Rothschild"). In 2015, one of Rothschild's companies, Display Technologies, LLC, brought suit against Valve for infringement of U.S. Pat. No. 8,671,195. To resolve that lawsuit, and prevent future lawsuits against Valve by Display Technologies and Rothschild, Valve entered into a Global Settlement and License Agreement with both Display Technologies and Rothschild (the "Global Settlement"). The Global Agreement granted Valve a license to all of Rothschild's patents that could conceivably be construed to cover any portion of Valve's business. We assume you have the Global Settlement, but another copy is enclosed with this letter.

After the Global Settlement, Valve did not hear from Rothschild again for about 6 years. But then, earlier this year, Valve received a few marketing messages from a Daniel Falcucci, apparently a representative or agent of another of Rothschild's companies, Patent Asset Management. Here is the substance of one of those messages:

> My name is Daniel Falcucci, and I'm the Director of Business Development at Patent Asset Management. Our company is headed by Leigh Rothschild, a prolific and well known inventor, and we focus on enforcing the rights of patent holders. Around 2015/16, our company had entered into an Agreement with Valve Corporation, titled "Global Settlement and License Agreement."

> We were happy to reach an agreement then, and I'm wondering if you or someone at Valve would like to discuss reaching a new deal? Our company has acquired a number of valuable patent assets in the past few years, and I'd like to propose a renewed agreement that includes our new inventory.

*Please let me know, and I'd be happy to schedule a time to talk more.*

*Regards,*

*Daniel*

Mr. Falcucci clearly had not done any analysis of Valve's activities, or compared those activities to any of Rothschild's patents. Instead, he merely invited Valve to pay more fees and enter into another license agreement with Rothschild simply because it had done so in the past.

When Valve did not respond to Mr. Falcucci's inquiries, your firm filed suit against Valve on behalf of two Rothschild entities, Display Technologies, LLC and Social Input Positioning Systems, LLC. You clearly had no knowledge of the Global Settlement prior to filing those lawsuits, as when I provided you with a copy you immediately dismissed the suit on behalf of Display Technologies, LLC because Valve already had a license to the patent asserted in that lawsuit. This behavior indicates that you had failed to do the appropriate Rule 11 inquiry before filing either suit. Your filing of the suit on behalf of Display Technologies was also a clear breach of the terms of the Global Settlement by both Display Technologies and Rothschild.

The lawsuit on behalf of Social Input Positioning Systems is as baseless as the one that you filed on behalf of Display Technologies, LLC. The '365 Patent is clearly related to a positional information device used to help drivers of vehicles find addresses, and has absolutely nothing to do with the tracking done by a virtual reality gaming device. This fact is readily apparent from the face of the patent and the text of the patent claims. Social Input Positioning Systems' long history of litigating the '365 Patent against makers of GPS systems confirms that it is well aware of the potential scope of its patent.

Moreover, the device that Social Input Positioning Systems asserts infringes the '365 patent is the HTC Vive—a product that Valve does not make or sell. Indeed, the page on Valve's Steam website that is referenced in the claim chart attached to the complaint very clearly shows that you cannot purchase the HTC Vive from Valve—you would have needed to visit the HTC website to purchase it (*See* https://store.steampowered.com/app/358040/VIVE_Cosmos_Elite/).

The '365 Patent is also invalid under 35 U.S.C. § 101 at least because it is directed to the abstract idea of sharing addresses.

To date, Valve has not formally retained outside counsel for this matter. That said, we will do so no later than January 2, 2023. We urge you to immediately make a reasonable investigation of the information provided here. That investigation should lead to dismissal of the complaint. But, if you persist in pursuing the case against Valve on behalf of Social Input Positioning Systems after that date, Valve will seek sanctions as determined by the Court under Fed. R. Civ. P. 11.

Sincerely,

Christopher Schenck
Legal Counsel, Valve Corporation

## GLOBAL SETTLEMENT AND LICENSE AGREEMENT

This Settlement and License Agreement (this "Agreement") is made effective as of ~~August 10, 2015~~ (the "Effective Date"), by and between, Display Technologies, LLC, a Texas limited liability company ("Display"), with a principal place of business at 1400 Preston Road, Ste. 400, Plano, TX 75093, and Leigh Rothschild ("Inventor") (Display and Inventor, collectively, are referred to as "Licensor"), on the one hand, and Valve Corporation ("Licensee"), a corporation, with a principal place of business at 10900 NE 4th St., Ste. 500, Bellevue, WA 98004, on the other hand. The term "Parties" shall refer collectively to Display, Inventor, and Licensee and each, individually as appropriate, a "Party."

WHEREAS, Display owns U.S. Patent No. 8,671,195, respectively entitled "Digital Media Communication Protocol," and has asserted that Licensee is infringing one or more claims of this patent through the sale of Licensee products;

WHEREAS Display brought suit in the United States District Court for the Eastern District of Texas, Marshall Division, Civil Action No. **2:15-cv-999** (the "Pending Litigation"), regarding U.S. Patent No. 8,671,195;

WHEREAS Licensee denies Display's allegations of infringement;

WHEREAS the Parties desire to minimize the time and expense of litigation and therefore desire to resolve the Pending Litigation on the terms set forth herein;

WHEREAS Inventor controls Display, as well as a number of other entities that have been assigned all necessary rights to license patents on which Inventor is the named inventor; and

WHEREAS the Parties desire to enter into a license agreement for patents assigned to entities controlled by Inventor, listed in Exhibit C attached to this agreement, including but not limited to the '195 patent assigned to Display;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

### 1.    Definitions

The terms set forth below shall have the following meanings in the Agreement:

1.1.    "Affiliate" means, in relation to any Party hereto, any and all "Persons" (as hereinafter defined) now, at any time since the filing of the Pending Litigation, or in the future "Controlled" (the term "Control" and correlatives thereof shall have the meaning more particularly set forth herein) by, Controlling, or under common Control with that Party or any parent company of a Party and any subsidiary thereto.

*lmr*

CONFIDENTIAL OUTSIDE
ATTORNEYS' EYES ONLY

1.2    In the event that a Person is not an Affiliate as of the Effective Date of this Agreement, but later becomes an Affiliate through an acquisition by Licensee (an "Acquired Affiliate"), such Acquired Affiliate shall be deemed to be an Affiliate for the purposes of this Agreement upon completion of such transaction or transactions, but nothing herein shall limit or impair Licensor's rights to prosecute or maintain any claim against any Acquired Affiliate with respect to activities, events or transactions occurring prior to the time when such Person became an Acquired Affiliate. To the extent Licensee is acquired by or merges with another entity or reorganizes organizations in the future in a manner that meet the Control requirements herein, this shall be deemed a change in Control subject to Section 7.1.

1.3    Furthermore, in the event an Affiliate covered by this Agreement ceases to be an Affiliate (a "Departing Affiliate"), any rights under this Agreement shall continue to apply to such Departing Affiliate to the extent of the Departing Affiliate's pre-departure Licensed Products as an Affiliate of Licensee, but shall not extend to any products of any Third Party that acquires such Departing Affiliate or any products of any Third Party acquired by such Departing Affiliate.

1.4.    "Control" (and correlatives thereof) with respect to a Party or Person means (a) the legal, beneficial, or equitable ownership, directly or indirectly of fifty percent (50%) or more of the securities (or other equity interests) of the Person that ordinarily have voting rights in the election of the directors or equivalent managers of the Person, or (b) the possession, directly or indirectly, of the power to direct or cause the direction of management or policies of the Person, whether through the legal, beneficial, or equitable ownership or control of voting securities of the Person, appointment of more than fifty percent (50%) of the board of directors of the Person, by contract, or otherwise.

1.5.    "Licensed Patents" means the patents identified in Exhibit C and any continuations, divisionals, continuations-in-part, extensions, reissues, reexaminations, and any other patents or patent applications claiming priority to or through the patents identified in Exhibit C, and/or substitution patents and/or patent applications thereof, as well as any and all foreign counterparts of any of the foregoing. In the event that Licensor gains control or ownership of any patent listed in Exhibit D, attached to this agreement, "Licensed Patents" shall include those patents from Exhibit D which Licensor gains ownership or control over..

1.6.    "Exploit" means to, in whole or in part, directly or indirectly: own, make, have made, design, develop, author, write, use, sell, offer to sell, supply, purchase, license, offer to license, distribute, lease, import, export, operate, perform, provide, display, transmit, or otherwise transfer, practice, or dispose of, and the exercise of all other activities.

2

*lmr*

1.7.   "Licensed Products" means all past, present and future machines, manufactures, compositions of matter, methods, processes, apparatuses, devices, hardware, software, applications, data, products, web sites, systems and other products and services, or any combination of one or more of the foregoing, ever Exploited by or on behalf of Licensee, which in the absence of this Agreement would infringe at least one of the claims of the Licensed Patents. "Licensed Products" shall not include the machines, manufactures, compositions of matter, methods, processes, apparatuses, devices, products, web sites, systems or services of any Third Party (any of the foregoing a "Third Party Product"), except to the extent such Third Party Product is or was Exploited: (i) within or as any part or portion of Licensee's Licensed Product; (ii) for the direct benefit of Licensee; or (iii) by or on behalf of Licensee.

1.8.   "Person" shall mean a trust, corporation, partnership, joint venture, limited liability company, association, unincorporated organization or other legal or governmental entity.

1.9.   "Third Party" means a Person other than the Parties.

## 2.   **Releases and Covenants**

2.1.   **Licensor Release of Licensee.**  Subject to the payment provided under Section 5.1, Licensor irrevocably releases, acquits and forever discharges Licensee, its Affiliates, and its respective officers, directors and attorneys from any and all past, present, or future claims or liabilities of any kind and nature, at law, in equity, or otherwise, known or unknown, suspected or unsuspected, disclosed or undisclosed, arising out of or relating in any way to acts of Licensee or its Affiliates in connection with: (i) the claims and counterclaims asserted in the Pending Litigation; (ii) the Licensed Patents solely with respect to the Licensed Products; and/or (iii) the conduct of settlement negotiations occurring before the Effective Date (except for representations or obligations expressly included in this Agreement).

2.2.   **Licensor Release of Third Parties.**  Subject to the payment provided under Section 5.1, Licensor irrevocably releases, acquits and forever discharges all vendors, suppliers, manufacturers, developers, depositors, distributors, contractors, partners, hosts, direct and indirect customers, and end-users of Licensee or the Licensed Product (such third parties individually referred to herein as a "Licensee Third Party" and collectively as the "Licensee Third Parties") from any and all past, present, or future claims or liabilities of any kind and nature, at law, in equity, or otherwise, known and unknown, suspected and unsuspected, disclosed and undisclosed, arising out of or relating in any way to acts of a Licensee Third Party or the Licensee Third Parties in connection with the Licensed Patents solely with respect to the Licensed Products. For clarity, this release shall only protect Licensee Third Parties to the extent their activities concern or relate to Licensed Products.

3

*lmr*

CONFIDENTIAL OUTSIDE
ATTORNEYS' EYES ONLY

2.3. **Licensee's Release.** Subject to the compliance by Licensor with the terms and conditions of this Agreement, Licensee irrevocably releases, acquits and forever discharges Licensor and their respective officers, directors, shareholders, members, employees, agents, consultants, experts, representatives, and attorneys from any and all claims or liabilities of any kind and nature, at law, in equity, or otherwise, known or unknown, suspected or unsuspected, disclosed or undisclosed, arising out of or relating in any way to acts of Licensor in connection with the claims and counterclaims asserted in the Pending Litigation, with respect to the Licensed Patents and with respect to the conduct of settlement negotiations occurring before the Effective Date (except for representations or obligations expressly included in this Agreement). Notwithstanding the foregoing, nothing in this Paragraph or in this Agreement shall prevent Licensee or any Licensee Third Party (other than as provided in Paragraph 3.5 hereof) from asserting that any of the Licensed Patents are invalid, not infringed or unenforceable if the Licensed Patents are asserted against Licensee or any Licensee Third Party.

3. **Grants and Covenants**

3.1. **Licensor License to Licensee.** Subject to the payment provided under Section 5.1, Licensor hereby grants to Licensee and Licensee's Affiliates a non-exclusive, non-transferable (except as provided for in Section 7.1), perpetual, irrevocable, royalty-free, fully paid-up, worldwide license, without the right to sublicense, in and to the Licensed Patents solely to Exploit the Licensed Products. Licensor hereby also grants to Licensee Third Parties, manufacturers, developers, vendors, suppliers, distributors, contractors, depositors, partners, hosts, direct or indirect customers and end-users a non-exclusive, non-transferable (except as provided for in Section 7.1), perpetual, irrevocable, royalty-free, fully paid-up, worldwide license, without the right to sublicense in and to the Licensed Patents solely to Exploit the Licensed Products. Under the terms of this Agreement, Licensee shall have no right to sublicense and further, there is no right to further sublicense by any Third Party. No royalties or additional payments of any kind shall be required in order to maintain this Agreement in force.

3.2. **Covenant Not to Sue Licensee.** Subject to the payment provided under Section 5.1, Licensor covenants not to sue Licensee or its Affiliates for actual or alleged infringement of the Licensed Patents. Licensor further covenants not to sue Licensee Third Parties and their respective direct or indirect customers, depositors, end-users, suppliers, vendors, manufacturers, hosts, partners, distributors, contractors, developers and other Third Parties for actual or alleged infringement of any Licensed Patents to the extent such actual or alleged infringement is based on activities that concern or relate to Licensed Products.

3.3. **Covenant Not to Sue Licensor.** Subject to the compliance by Licensor with the terms and conditions of this Agreement, Licensee covenants not to sue Licensor for any claims with respect to the Licensed Patents.

4

*lmr*

CONFIDENTIAL OUTSIDE
ATTORNEYS' EYES ONLY

3.4. **No Other Rights.** No rights are granted under any Patents except as expressly provided in this Agreement, whether by implication, estoppel, or otherwise. No right to grant covenants, rights, or sublicenses or to become a foundry for Third Parties is granted under this Agreement.

3.5. **Future Enforcement Activity by Licensor.** In the event that Licensor brings a claim under the Licensed Patents against any Licensee Third Party or any entity that claims that the alleged infringing conduct arises out of any communication, interaction, transaction, cooperation, or contractual obligation with or on behalf of Licensee, then upon Licensee providing written notice and sufficient written evidence to corroborate that claim, then Licensor shall within ten (10) days cause such claim to be dismissed with respect to such entity, to the extent the claim is based on conduct that is properly subject to protection from suit under Section 2.1, 2.2, 3.1 or 3.2.

4. **Dismissal of Litigation**

4.1. **Timing of Dismissal.** Within five (5) court days after the payment of the consideration to Licensor under Section 5.1 below, the Parties shall cause their respective counsel to file the stipulated motion as set forth in Exhibit A, dismissing with prejudice all claims brought by Licensor against Licensee, dismissing with prejudice all non-infringement counterclaims brought by Licensee, and dismissing without prejudice all invalidity counterclaims brought by Licensee in the Pending Litigation, to the extent any such claims or counter claims have been raised in litigation between the Parties at that time. The Parties shall promptly proceed with any and all additional procedures needed to effect the above dismissal. If for any reason (except for Licensee's failure to make the payment under Section 5.1), Licensor or its counsel refuses to file the motion as set forth in Exhibit A, Licensee shall have the right to demand Licensor immediately refund in full the Consideration to Licensee.

4.2. **Costs.** The Parties agree that they shall bear their own costs and attorneys' fees relating to the Pending Litigation and to the negotiation of this Agreement.

4.3. **Dismissal of Licensee Third Parties.** To the extent Licensor has any pending lawsuits against Licensee Third Parties related to the Licensed Products and the Licensed Patents, Licensor will undertake to dismiss with prejudice all claims against Licensee Third Parties related to the Licensed Products within 5 days after Licensor's receipt of the payment of the "Consideration" (as hereinafter defined), provided Licensee provides written notice to Licensor of the lawsuits involving such Licensee Third Parties.

5. **Consideration**

5.1. **Payment.** In consideration of the licenses, releases, and covenants granted by Licensor and the dismissal by Licensor of the Pending Litigation, Licensee agrees

5

*lmr*

to pay to Licensor **Redacted for Confidentiality** **Redacted for Confidentiality** The Consideration shall be paid within five (5) days of the Effective Date. Such payment shall be by electronic or wire transfer to an account specified by Licensor and attached to this Agreement as Exhibit B. No other payments are required by this Agreement. Notwithstanding anything contained herein to the contrary, this Agreement shall not be effective until the Consideration has been received by Licensor. The Parties hereby agree that this is a settlement and no representation is made by Licensor that the foregoing Consideration represented a reasonable royalty from the infringement alleged in the Litigation. The Consideration paid to Licensor under this Agreement shall be nonrefundable, including in the event of a finding of invalidity, unenforceability, or non-patentability of the Licensed Patents.

5.2. **Taxes.** Licensor shall bear all U.S. taxes imposed with respect to payments made to it hereunder. For clarity, this does not include any other taxes, charges, or fees, for example, non-U.S. taxes or non-U.S. tax withholdings.

5.3. **No Withholding.** Licensee's payment of the Consideration hereunder shall be made free and clear of any taxes, withholding taxes, assets, duties, permits, tariffs, fees and other charges of any kind.

6. **Term and Termination**

6.1. **Term.** The term of this Agreement shall be from the Effective Date until the expiration of the last-to-expire Licensed Patents, unless earlier terminated as allowed by this Agreement, provided that the licenses, releases, and covenants granted by Licensor herein shall survive in perpetuity.

6.2. **Agreement Obligations Not Released.** Notwithstanding anything to the contrary herein, the Parties reserve all rights and remedies, including damages and equitable relief, for breach of this Agreement by the other Party and nothing herein releases any Party from its respective obligations under this Agreement or prevents any Party from enforcing the terms and conditions of this Agreement against the other.

7. **Assignment and Change of Control**

7.1. **Assignment by Licensee.** Licensee may assign its rights under this Agreement without prior written consent of Licensor as follows: (A) In the event of a change of Control of Licensee, this Agreement shall continue to benefit and obligate Licensee or the successor entity and the licenses granted in Subsection 3.1 may be assigned to such successor entity, provided that (i) such licenses will extend only to the Licensed Products and that part of the business relating to the Licensed Products prior to such change of Control and will not extend to any machines, manufactures, compositions of matter, methods, processes, apparatuses, devices,

6

*lmr*

CONFIDENTIAL OUTSIDE ATTORNEYS' EYES ONLY

products, web sites, systems of the successor or acquiring entity (other than the Licensed Products (or reasonable extensions of the foregoing and whether rebranded or not) of the Licensee's business that existed prior to the change of Control); and (ii) the obligations of Licensee are similarly assigned. (B) Licensee may assign its rights under this Agreement, in whole or in part, as part of a sale, transfer, or spin-off of a substantial portion of Licensee or its Affiliate's business, provided that any assignment of rights under this Agreement shall only extend to the Licensed Products of Licensee and/or of its Affiliates immediately prior to the date of the sale, transfer or spin-off and will not extend to any other products, services or activities prior to, on or after the effective date of the assignment except with respect to the same type and scope of Licensed Products that were conducted immediately prior to the sale, transfer, or spin-off. All rights under this Agreement shall continue to apply to a Departing Affiliate to the extent of the Departing Affiliate's pre-departure Licensed Products as an Affiliate of Valve, but shall not extend to any activities of any Third Party that acquires such Departing Affiliate or any activities of any Third Party acquired by that Departing Affiliate.

Any assignment or transfer of licenses in violation of this Subsection 7.1 shall be null and void, but only from such time as the violation occurs. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the Parties and their permitted successors and assigns. Except as set forth in this Section 7.1, this Agreement may not be assigned by Licensee without the prior written permission of Licensor, and any attempt to assign without such permission will be void.

7.2. **Assignment by Licensor.** Licensor may not assign, or exclusively license, any of the Licensed Patents without such assignee or licensee agreeing to be bound by the obligations of Licensor hereunder as if it were a party hereto, and any assignment or exclusive license made in violation of this provision shall be void.

7.3. **Notice of Assignments.** To the extent either Party makes an assignment, whether complete or partial, of its rights under this Agreement where permitted by the express terms of the Agreement, that Party shall provide written notice to the nonassigning Party. In the event of any change of control of Licensee, a public announcement of such change of control shall be deemed to constitute written notice of assignment for purposes of this section.

7

*lmr*

CONFIDENTIAL OUTSIDE
ATTORNEYS' EYES ONLY

VALVE_TH_0013848

8.  **Notices**

    8.1.   Notices and other communications regarding or under this Agreement shall be sent (i) by overnight courier or by registered or certified mail and (ii) if available, electronic mail to the following addresses:

        1.1.1.  Notices to Licensor shall be sent to Licensor's agents at:

            Ni Wang & Massand, PLLC
            8140 Walnut Hill Lane
            Suite 310
            Dallas, Texas 75231
            nmassand@nilawfirm.com

            ..............................................................

        1.1.2.  Notices to Licensee shall be sent to Licensee at:

            Valve Corporation
            c/o General Counsel
            10900 NE 4th Street
            Suite 500
            Bellevue, WA 98004

            With a copy to:

            Ed Cavazos
            Pillsbury Winthrop Shaw Pittman LLP
            111 Congress Ave., Suite 400
            Austin, Texas 78701
            ed.cavazos@pillsburylaw.com

    8.2.   A Party may change the above addresses for notices relating to this Agreement in a written notice to the other Party complying as to delivery with the terms of Section 8.1. All such notices, requests, demands and other communications shall be effective, if by mail or overnight courier, when delivered or if not delivered due to refusal or failure to advise the other Party of a change of address, five (5) days after depositing such notice in the U.S. mail or one (1) day after depositing such notice with an overnight courier.

9.  **Representations, Warranties and Disclaimers**

    9.1.   Each Party and each person signing this Agreement on behalf of a Party represents and warrants to the other that it has the full right and power to enter

8

*lmr*

CONFIDENTIAL OUTSIDE
ATTORNEYS' EYES ONLY

VALVE_TH_0013849

into this Agreement, and the person executing this Agreement has the full right and authority to enter into this Agreement on behalf of such Party and the full right and authority to bind such Party to the terms and obligations of this Agreement.

9.2.   Licensor represents and warrants that as of the Effective Date (a) Licensor is the sole owner of the entire right, title and interest in and to the Licensed Patents, including all rights to enforce and sue for past damages, as reflected by the "Assignee" entities listed in Exhibit C; and (b) Licensor has the right and authority to grant the rights, licenses and releases hereunder on behalf of the entities listed in Exhibit C.

9.3.   Other than that which is required of Licensee by Court Order or rule of law, Licensee represents and warrants that it will not contest or assist in contesting the validity or enforceability of the Licensed Patents and will so instruct its counsel and consultants retained for this case other than those retained in conjunction with co-defendants not to contest or assist in contesting the validity or enforceability of the Licensed Patents on Licensee's behalf. If Licensee (or its counsel on Licensee's behalf) intentionally or knowingly contests or assists in the contesting of the validity or enforceability of the Licensed Patents, Licensor will have the right to unilaterally terminate this Agreement. For the avoidance of doubt, no production or response by Licensee to a subpoena or other order of a court of competent jurisdiction shall be considered contesting or assisting with a contest under this Section. Nothing in this section shall be construed so as to restrict any counsel, including Licensee's counsel in the Pending Litigation, from taking any action whatsoever (including challenging the validity and enforceability of the Licensed Patents in any judicial or administrative forum) on behalf of their clients who are not parties to this Agreement. Nothing in this Paragraph or in this Agreement shall prevent Licensee from asserting that any of the Licensed Patents are invalid, not infringed or unenforceable if the Licensed Patents are asserted against Licensee or its Licensee Third Parties.

9.4.   EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT, NEITHER LICENSOR NOR LICENSEE MAKES ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED, OR ASSUMES ANY RESPONSIBILITIES WHATSOEVER WITH RESPECT TO THE COMMERCIAL SUCCESS, USE, SALE, OR OTHER DISPOSITION BY OR FOR ANY OTHER PARTY (OR ITS SUBSIDIARIES) OR THEIR DISTRIBUTORS, USERS, OTHER CUSTOMERS, OR SUPPLIERS OF PRODUCTS INCORPORATING OR MADE BY THE USE OF INVENTIONS LICENSED HEREIN. LICENSOR DOES NOT CONVEY ANY RIGHT OR LICENSE (EXCEPT TO THE EXTENT NECESSARY TO EXERCISE THE RIGHTS EXPRESSLY GRANTED HEREIN) BY IMPLICATION,

9

*lmr*

CONFIDENTIAL OUTSIDE ATTORNEYS' EYES ONLY

VALVE_TH_0013850

ESTOPPEL, OR OTHERWISE, EXCEPT AS EXPRESSLY GRANTED HEREIN.

9.5. In no event shall Licensor be liable for any special, punitive or exemplary damages or for loss of profits or revenue, or any indirect, consequential or incidental damages arising out of, or in connection with, this Agreement and the Licensed Products. Further, in no event shall Licensor be found liable for damages to any party for any amount that exceeds the aggregate total amount of Consideration paid hereunder with respect to this Agreement and the Licensed Products. In no event shall Licensee be liable for any special, punitive or exemplary damages or for loss of profits or revenue, or any indirect, consequential or incidental damages arising out of, or in connection with, this Agreement.

## 10. Confidentiality, Publicity Material and Marketing

10.1. Nothing in this Agreement shall confer upon any Party any right to include in advertising, packaging or other commercial activities, any reference to the other Parties in any manner whatsoever.

10.2. Each Party agrees not to disclose the terms of this Agreement to any third party without the prior written consent of the other Party, which may be withheld in such parties sole and absolute discretion. This obligation is subject to the following exceptions:

1.1.1. disclosure is permissible if required by government or court order, including litigation document requests and SEC (or equivalent) reporting requirements, but only to the extent so required, provided that such disclosure is subject to confidential treatment to the fullest extent allowed by law;

1.1.2. disclosure is permissible if otherwise required by law or required during the course of litigation (e.g., subpoena, discovery request or equivalent), but only to the extent so required and provided that such disclosure does not affect the confidential nature of such information;

1.1.3. disclosure is permissible to the extent the information becomes publicly available by judicial order or action;

1.1.4. disclosure is permissible if required to enforce rights under this Agreement; and

1.1.5. each Party may disclose this Agreement or its contents to the extent reasonably necessary, on a confidential basis, to its Affiliates, accountants, attorneys, auditors, and financial advisors or those of any third party in connection with a financing or corporate transaction.

10

*lmr*

CONFIDENTIAL OUTSIDE
ATTORNEYS' EYES ONLY

VALVE_TH_0013851

1.1.6. Licensee may disclose this Agreement to all Licensee Third Parties covered by the releases, grants, and covenants provided in Sections 2 and 3 above.

1.1.7. Licensor may disclose the fact that a settlement and/or license agreement has been reached with Licensee in connection with any other litigation or enforcement efforts by Licensor with respect to the Licensed Patents. The terms of the settlement or license shall remain confidential pursuant to the terms hereof.

## 11. **General Terms**

11.1. The construction, validity and performance of the Agreement shall be governed in all respects (without regard to conflicts of law provisions) by the law of the State of Texas, United States of America, as such law applies to contracts signed and fully performed in the State of Texas. The Parties hereby submit to the jurisdiction of, and waive any venue objections against, the State and Federal courts in Texas.

11.2. Nothing in the Agreement is to be construed as requiring the commission of any act contrary to law. Wherever there is any conflict between any provision of the Agreement and any statute, law or ordinance, or a treaty and its valid regulations, the statute, law, ordinance, or treaty and its valid regulations shall prevail. In such event the provisions of the Agreement shall be curtailed and limited only to the extent necessary to bring them within the legal requirements, and such provisions, so curtailed and limited, together with all other provisions of the Agreement shall continue in full force and effect.

11.3. All rights granted under the covenants not to assert, releases, discharges and other rights granted under or pursuant to this Agreement are, and shall otherwise be deemed to be, for purposes of Section 365(n) of Title 11, U.S. Code (the "Bankruptcy Code"), licenses and rights to "intellectual property" as defined under Section 101 of the Bankruptcy Code. The Parties agree that each Party shall retain and may fully exercise and enjoy all rights and elections available to them under the Bankruptcy Code and other applicable laws and regulations.

11.4. This Agreement will not be binding upon the Parties until it has been signed herein below by or on behalf of each Party, in which event, it shall be effective as of the Effective Date. No amendment or modification hereof shall be valid or binding upon the Parties unless made in writing and signed as aforesaid.

11.5. The failure of a Party to enforce any provision of this Agreement shall not prevent the subsequent enforcement of such provision. No waiver of any provision of this Agreement shall be deemed or shall constitute a waiver of any other provision, whether or not similar, nor shall any waiver constitute a continuing

11

*lmr*

CONFIDENTIAL OUTSIDE
ATTORNEYS' EYES ONLY

waiver unless expressly stated in writing by the party making the waiver. No waiver of any provision shall be binding in any event unless executed in writing by the party making the waiver.

11.6. The headings of the several Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning and interpretation of this Agreement.

11.7. This Agreement embodies the entire understanding of the Parties and supersedes all previous communications, representations or understandings, either oral or written, between the Parties relating to the subject matter hereof.

11.8. Each Party shall bear its own costs, expenses and attorneys' fees incurred in connection with the making of this Agreement, and its performance under this Agreement. Each Party expressly waives any claim of costs and attorneys' fees from or against the other Party, including, without limitation, any attorneys' fees or costs that may already have been awarded in any action.

11.9. The language of this Agreement has been approved by counsel for each Party, and neither Party (nor their respective counsel) shall be deemed to be the draftsman of this Agreement. Thus, any rule of construction to the effect that ambiguities are to be resolved against the drafting Party will not be applied in the interpretation of this Agreement. The words "include" and "including" and variations thereof, will not be deemed to be terms of limitation in this Agreement, but rather will be deemed to be followed by the words "without limitation." The headings in this Agreement are for convenience and organization only, and not intended to constitute the substance of this Agreement and will not be referred to in connection with the construction or interpretation of this Agreement.

11.10. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute but one and the same instrument. Such counterparts may be exchanged by fax, or scanned and exchanged by electronic mail, confirmed with printed copy, but shall be effective upon receipt of fax/electronic mail as applicable. The Parties agree that facsimile or scanned copies of signatures shall be deemed originals for all purposes hereof and that either Party may produce such copies, without the need to produce original signatures, to prove the existence of this Agreement in any proceeding brought hereunder.

11.11. Marking. Licensee asserts that it has not infringed any claim of the Licensed Patents and that it is not currently infringing any claim of the Licensed Patents. Licensee further acknowledges that, before entering into this Agreement, Licensee was not authorized to make, have made, sell, offer for sale, or import into the United States any product that infringed any claim of the Licensed Patents. From the Effective Date forward, for products that are not Licensed

12

*lmr*

CONFIDENTIAL OUTSIDE
ATTORNEYS' EYES ONLY

VALVE_TH_0013853

Products, Licensee will have no products that must be marked with notice of the Licensed Patents under 35 U.S.C. § 287.

13

*lmr*

CONFIDENTIAL OUTSIDE
ATTORNEYS' EYES ONLY

VALVE_TH_0013854

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed with intent to be bound as of the Effective Date.

**Display Technologies, LLC**

By ...............................................................

Name:   Leigh M. Rothschild

Title:   Managing Director

Date:   01/11/2016

**Leigh Rothschild (on his own and on behalf of all entities listed as "Assignee" in Exhibit C)**

By ...............................................................

Name:   Leigh M. Rothschild

Title:   Managing Director

Date:   01/11/2016

**Valve Corporation**

By ...............................................................

Name:   Scott Lynch

Title:   CEO

Date:   1/14/2016

THIS AGREEMENT DOES NOT BIND OR OBLIGATE EITHER PARTY IN ANY MANNER UNLESS DULY EXECUTED BY AUTHORIZED REPRESENTATIVES OF BOTH PARTIES

14

CONFIDENTIAL OUTSIDE
ATTORNEYS' EYES ONLY

VALVE_TH_0013855

**EXHIBIT A**

**THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| **DISPLAY TECHNOLOGIES, LLC** | |
| Plaintiff, | **Civil Action No. 2:15-cv-999** |
| v. | |
| **VALVE CORPORATION,** | **JURY TRIAL DEMANDED** |
| Defendant. | |

**MOTION TO DISMISS**

Under Federal Rule of Civil Procedure 41(a), Display Technologies, LLC ("Display")

dismisses its claims against Valve Corporation ("Valve") with prejudice against Valve and each

party bears its own attorneys' fees and costs.

15

*lmr*

CONFIDENTIAL OUTSIDE
ATTORNEYS' EYES ONLY

VALVE_TH_0013856

# THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | | |
|---|---|---|
| **DISPLAY TECHNOLOGIES, LLC** | | |
| Plaintiff, | | **Civil Action No. 2:15-cv-999** |
| v. | | |
| **VALVE CORPORATION,** | | **JURY TRIAL DEMANDED** |
| Defendant. | | |

## ORDER

In light of the Motion to Dismiss filed by Plaintiff Display Technologies, LLC

("Display"), the Court HEREBY ORDERS as follows:

1.    Display's claims against Valve Corporation are hereby dismissed WITH

PREJUDICE

2.    Display and Valve Corporation shall each bear their own attorneys' fees and

costs incurred in connection with this action.

16

*lmr*

CONFIDENTIAL OUTSIDE
ATTORNEYS' EYES ONLY

VALVE_TH_0013857

**EXHIBIT B**
**Wire Instructions**

| | |
|---|---|
| Account Name: | Ni Law Firm, PLLC IOLTA Account |
| Reference: | Display Technologies, LLC |
| Account No.: | 413981346 |
| Routing No.: | 111000614 |
| SWIFT Code: | CHASUS33 |
| Name of Bank: | JPMorgan Chase Bank, N.A. |
| Bank Address: | 3610 McKinney Ave., Dallas, TX 75204 |
| Bank Phone No.: | 214-443-1555 |

17

*lmr*

CONFIDENTIAL OUTSIDE
ATTORNEYS' EYES ONLY

VALVE_TH_0013858

Exhibit C
Licensed Patents

| No. | Patent Number | Title | Assignee |
|-----|---------------|-------|----------|
| 1 | 9054860 | Digital verified identification system and method | SRR Patent Holdings, LLC; |
| 2 | 8897833 | Wireless image distribution system and method | Leigh Rothschild |
| 3 | 8671195 | Digital media communication protocol | Display Technologies, LLC; |
| 4 | 8594722 | Wireless image distribution system and method | Rothschild Storage Retrieval Innovations, LLC; |
| 5 | 8437797 | Wireless image distribution system and method | Rothschild Storage Retrieval Innovations, LLC; |
| 6 | 8346920 | Managing network resource requests | SRR Patent Holdings, LLC; |
| 7 | 8307089 | System and method for storing broadcast content in a cloud-based computing environment | Ariel Inventions, LLC; |
| 8 | 8219590 | Media validation system | Rothschild Trust Holdings, L.L.C.; |
| 9 | 8204437 | Wireless image distribution system and method | Rothschild Storage Retrieval Innovations, LLC; |
| 10 | 7979434 | System and method for storing and retrieving digital content with physical file systems | SRR Patent Holdings, LLC; |
| 11 | 6101534 | Interactive, remote, computer interface system | Rothschild Digital Media LLC; |

18

*lmr*

CONFIDENTIAL OUTSIDE
ATTORNEYS' EYES ONLY

VALVE_TH_0013859

| 12 | 8856221 | System and method for storing broadcast content in a cloud-based computing environment | Ariel Inventions, LLC; |
|----|---------|------------------------------------------------------------------------------------------|------------------------|
| 13 | 9053498 | Systems and methods for indicating the existence of accessible information pertaining to articles of commerce | Reagan Inventions, LLC; |
| 14 | 8799088 | System and method for verifying user identity information in financial transactions | SRR Patent Holdings, LLC; |
| 15 | 7698164 | Method and system for providing a payment incentive for distributing digital files over a network | Matthew Inventions, LLC; |
| 16 | 8832542 | System and method of embedding symbology in alphabetic letters and then linking the letters to a site or sites on the global computer network | Leigh Rothschild |
| 17 | 8469270 | Systems and methods for indicating the existence of accessible information pertaining to articles of commerce | Reagan Inventions, LLC |
| 18 | 8151180 | System and method of embedding symbology in alphabetic letters and then linking the letters to a site or sites on the global computer network | Reagan Inventions, LLC |
| 19 | 8799263 | Systems, devices, and methods for providing multidimensional search results | Ariel Inventions, LLC |
| 20 | 8370141 | Device, system and method for enabling speech recognition on a portable data device | Reagan Inventions, LLC |

*lmr*

CONFIDENTIAL OUTSIDE ATTORNEYS' EYES ONLY

VALVE_TH_0013860

## Exhibit D
### Patents Licensed if Licensor Gains Ownership or Control

| No. | Patent Number | Title | Assignee |
|---|---|---|---|
| 1 | 8838693 | Multi-user media delivery system for synchronizing content on multiple media players | Portulim Foundation LLC; |
| 2 | 8504652 | Method and system for selectively supplying media content to a user and media storage device for use therein | Portulim Foundation LLC; |
| 3 | 8473514 | Media validation system | Schust Development LLC; |
| 4 | 8396931 | Interactive, multi-user media delivery system | Portulim Foundation LLC; |
| 5 | 8122466 | System and method for updating digital media content | Portulim Foundation LLC; |
| 6 | 8069164 | Media validation system | Schust Development LLC; |
| 7 | 8046813 | Method of enhancing media content and a media enhancement system | Portulim Foundation LLC; |
| 8 | 7711774 | Interactive, multi-user media delivery system | Portulim Foundation LLC; |
| 9 | 7631000 | Media validation system | Schust Development LLC; |
| 10 | 7318061 | Media validation and registration system | Schust Development LLC; |
| 11 | 8909729 | System and method for sharing digital media content | No apparent assignment; |
| 12 | 7503059 | Method of enhancing media content and a media enhancement system | Portulim Foundation LLC; |

20

*lmr*

CONFIDENTIAL OUTSIDE ATTORNEYS' EYES ONLY

VALVE_TH_0013861

| 13 | 6952697 | Media validation system | Schust Development LLC |
|----|---------|---------------------------|------------------------|
| 14 | 6766363 | System and method of linking items in audio, visual, and printed media to related information stored on an electronic network using a mobile device | Neomedia Technologies, Inc. |
| 15 | 6430554 | Interactive system for investigating products on a network | Neomedia Technologies, Inc. |

*lmr*

21

CONFIDENTIAL OUTSIDE
ATTORNEYS' EYES ONLY

VALVE_TH_0013862

# EXHIBIT 7

**HON. THOMAS S. ZILLY**

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

| | |
|---|---|
| **DISPLAY TECHNOLOGIES, LLC,** | **No.: 2:22-cv-01365-TSZ** |
| Plaintiff, | |
| v. | **NOTICE OF VOLUNTARY DISMISSAL WITHOUT PREJUDICE** |
| **VALVE CORPORATION,** | |
| Defendant. | **JURY TRIAL DEMANDED** |

Plaintiff Display Technologies, LLC ("Plaintiff" and/or "Display") files this Notice of Voluntary Dismissal Without Prejudice pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i). According to Rule 41(a)(1)(A)(i), an action may be dismissed by the plaintiff without order of court by filing a notice of dismissal at any time before service by the adverse party of an answer. Accordingly, Plaintiff hereby voluntarily dismisses this action against Defendant Valve Corporation ("Defendant" and/or "Valve") without prejudice, pursuant to Rule 41(a)(1)(A)(i) with each party to bear its own fees and costs.

DATED: October 13, 2022.

**MEYLER LEGAL, PLLC**

 /s/ Samuel M. Meyler
Samuel M. Meyler, WSBA #39471
1700 Westlake Ave. N., Ste. 200
Seattle, WA 98109

MEYLER LEGAL, PLLC
1700 WESTLAKE AVE. N., STE 200
SEATTLE, WASHINGTON 98109
TEL: (206) 876-7770 ● FAX: (206) 876-7771

1

2

3

4

Tel: 206-876-7770
Fax: 206-876-7771
E-mail: samuel@meylerlegal.com
*Counsel for Plaintiff Display Technologies,*
*LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on October 13, 2022, I electronically transmitted the foregoing document using the CM/ECF system for filing, which will transmit the document electronically to all registered participants as identified on the Notice of Electronic Filing, and paper copies have been served on those indicated as non-registered participants.

/s/ Samuel M. Meyler
Samuel M. Meyler, WSBA #39471

NOTICE OF VOLUNTARY DISMISSAL WITHOUT PREJUDICE - 2
(Case No. 2:22-cv-01365)

MEYLER LEGAL, PLLC
1700 WESTLAKE AVE. N., STE 200
SEATTLE, WASHINGTON 98109
TEL: (206) 876-7770 ● FAX: (206) 876-7771

# EXHIBIT 8



**A Professional Limited Liability Company**

*1700 Westlake Ave. N., Ste. 200*                      *Telephone: 206-876-7770*
*Seattle, Washington 98109*                            *Facsimile: 206-876-7771*
                                                       *E-mail: info@meylerlegal.com*

June 21, 2023

Christopher Schenck
Valve Corporation
10400 NE 4th Street, Suite 1400
Bellevue, WA 98004

**FRE 408 – SETTLEMENT COMMUNICATION**

**Re:      Social Positioning Input Systems, LLC v Valve Corporation
            Rothschild Broadcast Distribution Systems, LLC v Valve Corporation
            Quantum Technology Innovations, LLC v Valve Corporation**

Dear Mr. Schenck:

      As you will recall, I represent Social Positioning Input Systems, LLC ("SPIS"). In addition to SPIS, I represent Rothschild Broadcast Distribution Systems, LLC ("RBDS") and Quantum Technology Innovations, LLC ("QTI") with regard to their respective claims against Valve. For reference, I am including preliminary claim charts that have been prepared in anticipation of litigation.

      If Valve would like to explore a potential resolution to these claims, my clients are willing to delay the filing of their complaints as long as they feel that Valve is working toward a resolution in good faith. If I do not hear from you or Valve by June 30, 2023, my clients will assume that Valve would prefer to litigate.

Sincerely,

SAMUEL M. MEYLER

*Sent via email*
Enclosure(s)

**Infringement Claim Chart for U.S. Pat. No. 7,650,376 V. Valve Corporation ("Defendant")**

| Claim 37 | Evidence |
|---|---|
| 37. A computer readable storage medium or media encoded with one or more computer programs including instructions for effecting the provision of content over a network, comprising: | Defendant (Valve Corporation) provides an app i.e., the media encoded with a computer program (Steam app), and includes instructions for effecting the provision of content (i.e., Games) over a network (i.e., internet).<br><br><br><br>Source: https://www.valvesoftware.com/en/about<br><br><br><br>Source: https://store.steampowered.com/about/ |

Source: https://store.steampowered.com/about/



Source: https://store.steampowered.com/about/



Source: https://store.steampowered.com/about/



Source: https://store.steampowered.com/tags/en/Action/?flavor=contenthub_topsellers

| | |
|---|---|
| a) instructions for receiving a request from a client for specified content; | As shown below, the Steam app provides a user interface (presented through instructions within the app) that presents an interface to receive an input request from a user for specified content like games by different genres.<br><br><br><br>Source: https://store.steampowered.com/about/<br><br><br><br>Source: https://store.steampowered.com/ |





Source: https://store.steampowered.com/
Source:https://play.google.com/store/apps/details?id=com.valvesoftware.android.steam.community&hl=en&gl=US&pli=1

| b) instructions for communicating to the client the identity of a node server having the specified content stored thereon, | As shown below, when a user searches for any content (e.g., search games by different genres) in the search bar of the Steam application/web page, the instructions stored on the main server communicate the identity of the various serving nodes (i.e., various game developer or publisher) to the client device.<br><br><br><br>Source: https://store.steampowered.com/about/<br><br>Source: https://store.steampowered.com/ |



Source: https://store.steampowered.com/app/730/CounterStrike_Global_Offensive/

| c) thereby enabling the client to request transmission of the specified content from the node server; and | As shown below, the user may request transmission (i.e., play) of the specified content (e.g., games of different genres) from various serving nodes (i.e., various game developers or publishers) that are providing the specified content.<br><br><br><br>Source: https://store.steampowered.com/app/730/CounterStrike_Global_Offensive/ |

| d) instructions for ascertaining that the node server transmitted the specified content to the client, | As shown below, Steam at the request of the user, then ascertains that the specified content is being transmitted to the user from the requested node server. |
| --- | --- |
| |  |
| | Source: https://store.steampowered.com/about/ |
| | Source: https://store.steampowered.com/ |





Source: https://store.steampowered.com/
Source:https://play.google.com/store/apps/details?id=com.valvesoftware.android.steam.community&hl=en&gl=US&pli=1



Source: https://store.steampowered.com/app/730/CounterStrike_Global_Offensive/

| e) wherein an owner of the node server is offered an incentive as compensation for transmission of the specified content to the client. | As shown below, Steam offers a payment approach for cloud services. So, it must be a game developer or publisher who offers an incentive as compensation to the owner of the node server (e.g., Steam) for storage and transmission of the content to the user.<br><br>**Steam Direct Fee**<br>In order to get fully set up, you will need to pay a $100.00 USD fee for each product you wish to distribute on Steam (the "Steam Direct Fee"). You can pay this fee with any payment method supported by Steam in your region, except methods that use the Steam Wallet.<br><br>Source: https://partner.steamgames.com/steamdirect<br><br>Steam Greenlight was phased out and replaced with Steam Direct in June 2017.[251] With Steam Direct, a developer or publisher wishing to distribute their game on Steam needs only to complete appropriate identification and tax forms for Valve and then pay a recoupable application fee for each game they intend to publish. Once they apply, a developer must wait thirty days before publishing the game as to give Valve the ability to review the game to make sure it is "configured correctly, matches the description provided on the store page, and doesn't contain malicious content".[251]<br><br>Source: https://en.wikipedia.org/wiki/Steam_(service)#Steam_Direct |

**STORE SMARTS**

**Your purchases stay with your Steam account. So even if you buy a new computer, all your games will be fully accessible on the new machine.**

In addition, all your save games, inventory, personalization, and other data will be accessible from any PC, as well. Steam can be installed on Windows, MacOS, and Linux PCs. Steam libraries are even accessible remotely via phones, tablets, and TVs through the Steam Link app. You can log in to any PC, and all your games will be there. We don't believe in software that locks itself to being used only on one device (and we don't believe in trying to enforce platform exclusives) because those aren't things that customers ask us for.

Source: http://media.steampowered.com/apps/valve/2022/steamDeck_booklet_EN.pdf

**Pitch Scientific**

**Submitted To: PATENT ASSET MANAGEMENT**

# INFRINGEMENT SEARCH REPORT:

## US 8,856,221 B2

**Submitted By:** PITCH SCIENTIFIC

www.pitchscientific.com

# Contents

BIBLIOGRAPHIC DETAILS (SUBJECT PATENT) ......................................................................................................3

STEAM CLOUD .................................................................................................................................................4

MAPPING CHART ..............................................................................................................................................5

DISCLAIMER ...................................................................................................................................................12

**Pitch Scientific**

# BIBLIOGRAPHIC DETAILS (SUBJECT PATENT)

| | |
|---|---|
| *Patent Number* | US 8,856,221 B2 |
| *Title* | System and method for storing broadcast content in a cloud-based computing environment |
| *Earliest Priority Date* | 15 October, 2012 |
| *Filing Date* | 15 October, 2012 |
| *Grant Date* | 7 October, 2014 |
| *Assignee* | ROTHSCHILD BROADCAST DISTRIBUTION SYSTEMS LLC |
| *Inventor(s)* | Leigh M. Rothschild |
| *Number of Independent Claim* | 2 |
| *Number of Dependent Claims* | 11 |

# STEAM CLOUD

| | |
|---|---|
| **Product Release Date** | 2023 |
| **Source Link** | [Link 1], [Link 2] |
| **Company Name** | Valve |
| **US Sale or Use** | Yes [Link] |
| **Full Legal Name of The Company** | Valve Corporation |
| **Company Revenue** | $7.7 billion [Link] |
| **Product Overview** | The Steam Cloud provides an easy and transparent remote file storage system for your game. Files specified in the Auto-Cloud configuration or written to disk (created, modified, deleted, etc.) using the Cloud API will automatically be replicated to the Steam servers after the game exits. |
| **Company Overview** | Valve Corporation operates as a software company. The Company develops and publishes video games. Valve serves customers in the worldwide. |

## MAPPING CHART

| Key Features (Claim 7 of US8856221B2) | Product (Steam Cloud) |
|---|---|
| **Claim 7.** A method for storing media content and delivering requested media content to a consumer device, the method comprising: | The Steam Cloud allows games and the platform to utilize cloud storage hosted by Steam. Games can utilize Steam Cloud for storage of many different types of data, including game settings, save games, profile stats and other user-specific bits.<br><br>Also, many games do not use Steam cloud to store save games. The game developer will be able to help you find and transfer those files if you are using a new machine and still have access to the old one.<br><br>**Source:** https://help.steampowered.com/en/faqs/view/68D2-35AB-09A9-7678<br><br>The Steam Cloud provides an easy and transparent remote file storage system for your game. Files specified in the Auto-Cloud configuration or written to disk (created, modified, deleted, etc.) using the Cloud API will automatically be replicated to the Steam servers after the game exits.<br><br>**Source:** https://partner.steamgames.com/doc/features/cloud#initial-setup<br><br>*Remarks:* *Evidence discloses that the steam cloud provides the method for the storage of media contents like games and also for delivering or transferring the files (media content).* |
| **7.1** receiving a request message including media data indicating requested media content and a consumer device identifier corresponding to the consumer device; | When deciding where to write your save files, be sure the path will be unique for the current Steam user. If needed, you can get the user's unique Steam ID via ISteamUser::GetSteamID. From that, you can access their accountID from GetAccountID(), allowing you to have a unique variable when constructing your save path.<br><br>**Source:** https://partner.steamgames.com/doc/features/cloud#initial-setup<br><br>Also, many games do not use Steam cloud to store save games. The game developer will be able to help you find and transfer those files if you are using a new machine and still have access to the |

| Key Features (Claim 7 of US8856221B2) | Product (Steam Cloud) |
|---|---|
| | **old one. If you no longer have access to the previous machine, those save game cannot be recovered.**<br><br>**Source:** https://help.steampowered.com/en/faqs/view/68D2-35AB-09A9-7678<br><br>The **userdata folder will contain unique Steam IDs, which correspond to the Steam accounts that have logged in on that machine.**<br><br>Within the **Steam ID folders are the respective games associated with those Steam accounts, listed by appID.** The following example is for Dota 2.<br><br>**Source:** https://help.steampowered.com/en/faqs/view/68D2-35AB-09A9-7678.<br><br>*Remarks: Evidence discloses that there is unique Steam ID of stream user which logged on the machine requests for the media content (respective games) associated with those Steam accounts.* |
| **7.2 determining whether the consumer device identifier corresponds to a registered consumer device; and** | When deciding **where to write your save files, be sure the path will be unique for the current Steam user. If needed, you can get the user's unique Steam ID via ISteamUser::GetSteamID. From that, you can access their accountID from GetAccountID(),** allowing you to have a unique variable when constructing your save path.<br><br>**Source:** https://partner.steamgames.com/doc/features/cloud#initial-setup<br><br>The **userdata folder will contain unique Steam IDs, which correspond to the Steam accounts that have logged in on that machine.**<br><br>**Source:** https://help.steampowered.com/en/faqs/view/68D2-35AB-09A9-7678#where<br><br>The Steam Cloud allows games and the platform to utilize cloud storage hosted by Steam. Games can utilize Steam Cloud for storage of many different types of data, including game settings, save games, |

| Key Features (Claim 7 of US8856221B2) | Product (Steam Cloud) |
|---|---|
| | profile stats and other user-specific bits. Many **Steam client settings are also saved via the cloud, including collections, friend nicknames and anything changed via the Steam client** Settings menu. These **settings will persist on an account regardless of which machine it is logged into, as the settings are pulled from the cloud upon login.** |
| | Within the **Steam ID folders are the respective games associated with those Steam accounts, listed by appID.** The following example is for Dota 2. |
| | **Source**: https://help.steampowered.com/en/faqs/view/68D2-35AB-09A9-7678#where |
| | *Remarks:* Evidence discloses that unique Steam ID corresponds to the stream users that have logged on the machine. |
| **7.3 if it is determined that the consumer device identifier corresponds to the registered consumer device, then: determining, whether the request message is one of a storage request message and a content request message; and** | The **userdata folder will contain unique Steam IDs, which correspond to the Steam accounts that have logged in on that machine.** |
| | Within the **Steam ID folders are the respective games associated with those Steam accounts, listed by appID.** The following example is for Dota 2. |
| | **Source:** https://help.steampowered.com/en/faqs/view/68D2-35AB-09A9-7678. |
| | Maximum size **for a call to ISteamRemoteStorage::FileWrite or ISteamRemoteStorage::FileWriteStreamWriteChunk** |
| | If **you plan to read/write files directly via the ISteamRemoteStorage interface, then you can control platform sync via ISteamRemoteStorage::SetSyncPlatforms.** The default for a new file is to sync to all platforms. |
| | **Source**: https://partner.steamgames.com/doc/features/cloud#initial-setup |
| | Also, many games do not use Steam cloud to store save games. The game developer will be able to |

| Key Features (Claim 7 of US8856221B2) | Product (Steam Cloud) |
|---|---|
| | **help you find and transfer those files if you are using a new machine and still have access to the old one.** If you no longer have access to the previous machine, those save game cannot be recovered.<br><br>**Source**: https://help.steampowered.com/en/faqs/view/68D2-35AB-09A9-7678#where<br><br>*Remarks:* Evidence discloses that the users have logged in on machine by the unique Steam IDs and read/write files directly via the ISteam RemoteStorage interface. So it is interpreted that the file can be stored and accessed by the user via the ISteamRemoteStorage interface and the platform sync via ISteamRemoteStorage can be controlled by user. ISteam RemoteStorage interface show weather the request message by the user is for the read or write i.e., storage request or content access request. |
| **7.4** if the request message is the storage request message, then determining whether the requested media content is available for storage; and | **Steam Auto-Cloud was designed for games where you choose to not integrate the Steam Cloud API.** It provides **a quick and easy way to get started but lacks the flexibility that is available with the Steam Cloud API.**<br><br>If you **prefer a deeper integration with Steam Cloud (for example, allowing to choose which save files are stored in the cloud), then you should use the Cloud API. Otherwise you can use Steam Auto-Cloud.**<br><br>**Source:** https://partner.steamgames.com/doc/features/cloud#initial-setup<br><br>Steam Cloud **automatically stores files from your game on Steam's servers so your players can log into Steam and access their saved games from any computer.**<br><br>Configuration of file paths required on Steamworks website. Optionally, some **API calls required from within game code to Steamworks for upload, download, enumerate, and delete.**<br><br>**Source:** https://partner.steamgames.com/doc/features/cloud#initial-setup |

| Key Features (Claim 7 of US8856221B2) | Product (Steam Cloud) |
|---|---|
|  | *Remarks: Evidence discloses that the files (media content) are available for storing in the cloud can be determined by the steam cloud API. The steam cloud stores files automatically on server if there is media content to store.* |
| **7.5** <u>if the request message is the content request message,</u> **then** <u>initiating delivery of the requested media content to the consumer device;</u> | If the user changes computers, the <u>**files are automatically downloaded to the new computer prior to the game launching. The game can then access the files by reading them through the Cloud API**</u> or reading them directly from disk as usual. Avoid machine specific configurations such as video settings. <br><br> **Source:** https://partner.steamgames.com/doc/features/cloud#initial-setup <br><br><br> Steam Cloud <u>**automatically stores files from your game on Steam's servers**</u> so your players can log into Steam <u>**and access their saved games from any computer.**</u> <br><br> Configuration of file paths required on Steam works website. Optionally, some <u>**API calls required from within game code to Steamworks for upload, download, enumerate, and delete.**</u> <br><br> **Source:** https://partner.steamgames.com/doc/features/cloud#initial-setup <br><br><br> Steam creates an <u>**log entry any time that files are written to the cloud or retrieved from it.**</u> <br><br> **Source:** https://help.steampowered.com/en/faqs/view/68D2-35AB-09A9-7678 <br><br><br> GeForce NOW is NVIDIA's <u>**cloud-based game streaming service, delivering real-time gameplay straight from the cloud to your laptop, desktop, Mac, SHIELD TV, or Android device.**</u> <br><br> **Source:** https://partner.steamgames.com/doc/features/cloudgaming <br><br><br> *Remarks: Evidence discloses that there is log entry by the user ID which request for media content and the data stored in the cloud can be accessed and retrieved anytime i.e, the media content (real-* |

| Key Features (Claim 7 of US8856221B2) | Product (Steam Cloud) |
|---|---|
| | *time gameplay) can be delivered from the cloud to the consumer device (laptop, desktop, Mac, SHIELD TV, or Android device).* |
| **7.6** wherein the <u>media data includes time data that indicates a length of time to store the requested media content</u>; and | You will most likely want to pick the version of the files that was modified most recently. This means you will have the progress made the last time you played the game. However, **you would want to carefully consider how the dates and times in the conflict window for the cloud save files correspond to your behavior and progress within the game.** This context will help you decide which files to select.<br><br>**Source:** https://help.steampowered.com/en/faqs/view/68D2-35AB-09A9-7678<br><br>*Remarks: Evidence discloses the considered date and time for saving and storing the files in the cloud.* |
| **7.7** the first <u>processor is further configured to determine whether the requested media content exists</u>; and | Each time a user plays a game via Cloud Play they may be playing from a new virtual PC. <u>For this reason it is very important that your game has Steam Cloud enabled or has a separate online save system of its own.</u> If your game does not have either online save system, players of your game may lose their progress and saves when playing a game through a Steam Cloud Play service.<br><br>**Source:** https://partner.steamgames.com/doc/features/cloudgaming<br><br>Steam Cloud <u>automatically stores files from your game on Steam's servers so your players can log into Steam and access their saved games from any computer.</u><br><br>Configuration of file paths required on Steamworks website. Optionally, some <u>API calls required from within game code to Steamworks for upload, download, enumerate, and delete.</u><br><br>**Source:** https://partner.steamgames.com/doc/features/cloud#initial-setup<br><br>*Remarks: Evidence discloses that the files are stored on the stream server so that the players can* |

| Key Features (Claim 7 of US8856221B2) | Product (Steam Cloud) |
|---|---|
| | *request and access the media content from the server. The API (processor) calls for the required data to upload, download and delete. So, if the requested file is stored in the server then I can be accessed easily by the user.* |
| **7.8** **if the processor determines that the requested media content exists, the processor is further configured to determine whether the requested media content is available and whether there are restrictions associated with the requested media content** that prevent the **requested media content from being delivered to the consumer device.** | AV software hooks very **deep into user systems and can affect disk and network operations which may cause issues with Steam.** Some games also use copy protection technology that can appear as malicious software to an AV scanner, resulting in potential false-positive alerts. You'll want to work with a tech support specialist to ensure that your AV software is not interfering with Steam functionality. You may even need to temporarily disable it for testing purposes. It may also be necessary to add exceptions for Steam in your AV configuration. **Source:** https://help.steampowered.com/en/faqs/view/68D2-35AB-09A9-7678 If you are continually experiencing **issues with Steam cloud functionality**, it's possible that **something is interfering with the cloud** or preventing it from working as expected. Certain **firewalls may prevent Steam from talking to its servers.** You'll want to work with a tech support specialist to ensure that the Firewall is not interfering. You may even need to temporarily disable it for testing purposes or add exceptions to your firewalls for Steam. **Source:** https://help.steampowered.com/en/faqs/view/68D2-35AB-09A9-7678#where The absolute **limits on file sizes for Steam Cloud may change over time**. **Here are some current limits and thresholds:** *Remarks: Evidence discloses that there is some restrictions associated with the requested files (media content) which prevent the media file to be stored and delivered in the cloud steam. It is interpreted that there is size limit associated with media file to be stored and transferred.* |

# DISCLAIMER

This report is based on the information contained in files sent via email, and searches and analyses conducted by experts in the relevant technical domain. This report is NOT to be used as a substitute for any legal opinion that may be given by a patent attorney by considering legal point of view. PITCH SCIENTIFIC shall not be liable or responsible for any loss or damage suffered by any of its clients on account of any loss of opportunity or fees/fines/penalties assessed against or incurred as a result of any acts or omissions on the part of PITCH SCIENTIFIC in preparation of this report.

# HAVE A COMMENT OR QUERY ON THIS REPORT?

# MAIL US AT

# RESEARCH@PITCHSCIENTIFIC.COM

**Infringement Claim Chart for U.S. Pat. No US9261365B2 Vs Valve Corporation ("Defendant)**

| Claim 1 | Evidence |
|---|---|
| 1. A method for receiving location information at a positional information device, the method comprising: | Defendant (Valve Corporation) provides a product Vive (or HTC Vive) featuring SteamVR tracking which is a hardware/software solution that lets the devices (positional information device) know in real-time where they are within a room (location information) using multiple sensors.<br><br><br><br>Source: https://store.steampowered.com/app/358040/VIVE_Cosmos_Elite/ |



Source: https://partner.steamgames.com/vrlicensing

**ABOUT THIS HARDWARE**

VIVE Cosmos Elite is built for precision gaming. It comes paired with the VIVE Cosmos External Tracking Faceplate, which enables 360-degree, sub-millimeter SteamVR™ Tracking accuracy. The system provides the flexibility of modular faceplate technology for future VR and AR solutions.

Source: https://store.steampowered.com/app/358040/VIVE_Cosmos_Elite/

SteamVR Tracking has three main components:

**BASE STATION**

- 120° multi-axis laser emitter
- Aside from power, fully self-contained - no cable connection to the host or tracked objects
- 2 base-stations can be used for 360° coverage

**SENSORS ON TRACKED OBJECTS**

- Lightweight, low power, low cost ASIC sensors
- Up to 32 sensors per object for full 360° coverage
- Software toolkit to calculate optimal sensor placement
- Built-in 1000Hz IMU for low latency, high resolution tracking
- Wireless communication with host for cable-free peripherials

**HOST**

- Integrates 3D positional information from multiple devices. For now, this means a PC.
- SteamVR API for accurate timing, synchronization, and prediction
- Compatibility with Steam and access to the full SteamVR catalog

Source: https://partner.steamgames.com/vrlicensing

# SteamVR™ Tracking

Whether you're building a VR golf club or an indoor quad-copter, 3D tracking is the heart of your product. Developed in-house at Valve, SteamVR Tracking is a hardware/software solution that lets your devices know in real time where they are, within a room. Valve is now making SteamVR Tracking fully available to other companies, without licensing fees.

Source: https://partner.steamgames.com/vrlicensing

3

## How It Works

The SteamVR Tracking Basestations sweep the room with multiple sync pulses and laser lines, reaching out to about 5 meters. By keeping careful track of the timings between pulses and sweeps, the SteamVR Tracking system uses simple trigonometry to find the location of each sensor to within a fraction of a millimeter. By combining multiple sensors, 2 basestations, as well as adding a high speed IMU (inertial measurement unit), SteamVR also calculates the tracked object's orientation, velocity, and angular velocity, all at an update rate of 1000Hz.

Source: https://partner.steamgames.com/vrlicensing

4

| a) sending a request from a requesting positional information device to a server for at least one address stored in at least one sending positional information device, the request including a first identifier of the requesting positional information device; | Sending request to show real time location (i.e., at least one address stored) of user within a space includes first identifier (user login ID and password of Steam) of the requesting positional information device (e.g., PC) to the Steam server for transmitting the location of the user.<br><br>![SteamVR Tracking]<br><br>Source: https://partner.steamgames.com/vrlicensing<br><br>![SteamVR Tracking has three main components]<br><br>Source: https://partner.steamgames.com/vrlicensing |
|---|---|

5

Source: https://partner.steamgames.com/vrlicensing

## How It Works

The SteamVR Tracking Basestations sweep the room with multiple sync pulses and laser lines, reaching out to about 5 meters. By keeping careful track of the timings between pulses and sweeps, the SteamVR Tracking system uses simple trigonometry to find the location of each sensor to within a fraction of a millimeter. By combining multiple sensors, 2 basestations, as well as adding a high speed IMU (inertial measurement unit), SteamVR also calculates the tracked object's orientation, velocity, and angular velocity, all at an update rate of 1000Hz.

Source: https://partner.steamgames.com/vrlicensing

**ABOUT THIS HARDWARE**

VIVE Cosmos Elite is built for precision gaming. It comes paired with the VIVE Cosmos External Tracking Faceplate, which enables 360-degree, sub-millimeter SteamVR™ Tracking accuracy. The system provides the flexibility of modular faceplate technology for future VR and AR solutions.

Source: https://store.steampowered.com/app/358040/VIVE_Cosmos_Elite/

7



Source:https://store.steampowered.com/login/?redir=app%2F358040%2FVIVE_Cosmos_Elite%2F&redir_ssl=1&snr=1_5_9__global-header

| b)receiving at the requesting positional information device, from the server, a retrieved at least one address to the requesting positional information device | The Steam server transmits the position of the user (i.e. at least one address) to the requesting positional information device (e.g., PC.).<br><br><br><br>Source: https://partner.steamgames.com/vrlicensing<br><br><br><br>Source: https://partner.steamgames.com/vrlicensing |
|---|---|

9

Source: https://partner.steamgames.com/vrlicensing

| | |
|---|---|
| c) wherein the server determines a second identifier for identifying the at least one sending positional information device based on the received first identifier and retrieves the requested at least one address stored in the identified at least one sending positional information device. | The SteamVR tracking component of HTC Vive (requesting positional information device) requests (from the server) for the user's location (i.e., at least one address stored), before activating the multiple sensors (i.e., second identifier) needs to be added to the user's account identified by the user login ID and password (i.e., the first identifier). Hence, the multiple sensors (i.e., second identifier) is mapped to the user's login ID (i.e., the first identifier) for tracking the real-time location (i.e., at least one address stored) of user.<br><br><br><br>Source: https://partner.steamgames.com/vrlicensing |

Source: https://partner.steamgames.com/vrlicensing



Source: https://partner.steamgames.com/vrlicensing

## How It Works

The SteamVR Tracking Basestations sweep the room with multiple sync pulses and laser lines, reaching out to about 5 meters. By keeping careful track of the timings between pulses and sweeps, the SteamVR Tracking system uses simple trigonometry to find the location of each sensor to within a fraction of a millimeter. By combining multiple sensors, 2 basestations, as well as adding a high speed IMU (inertial measurement unit), SteamVR also calculates the tracked object's orientation, velocity, and angular velocity, all at an update rate of 1000Hz.

Source: https://partner.steamgames.com/vrlicensing

**ABOUT THIS HARDWARE**

VIVE Cosmos Elite is built for precision gaming. It comes paired with the VIVE Cosmos External Tracking Faceplate, which enables 360-degree, sub-millimeter SteamVR™ Tracking accuracy. The system provides the flexibility of modular faceplate technology for future VR and AR solutions.

Source: https://store.steampowered.com/app/358040/VIVE_Cosmos_Elite/

13



Source:https://store.steampowered.com/login/?redir=app%2F358040%2FVIVE_Cosmos_Elite%2F&redir_ssl=1&snr=1_5_9__global-header

# EXHIBIT 9

# PATENT ASSIGNMENT COVER SHEET

Electronic Version v1.1
Stylesheet Version v1.2

EPAS ID: PAT4380437

| SUBMISSION TYPE: | CORRECTIVE ASSIGNMENT |
|---|---|
| NATURE OF CONVEYANCE: | Corrective Assignment to correct the ASSIGNEE ADDRESS previously recorded on Reel 035074 Frame 0541. Assignor(s) hereby confirms the CORRECTIVE ASSIGNMENT. |
| RESUBMIT DOCUMENT ID: | 504329707 |

**CONVEYING PARTY DATA**

| Name | Execution Date |
|---|---|
| ARIEL INVENTIONS LLC | 02/25/2015 |

**RECEIVING PARTY DATA**

| Name: | ROTHSCHILD BROADCAST DISTRIBUTION SYSTEMS, LLC |
|---|---|
| Street Address: | 1400 PRESTON ROAD |
| City: | PLANO |
| State/Country: | TEXAS |
| Postal Code: | 75093 |

**PROPERTY NUMBERS Total: 2**

| Property Type | Number |
|---|---|
| Patent Number: | 8856221 |
| Patent Number: | 8307089 |

**CORRESPONDENCE DATA**

**Fax Number:**

*Correspondence will be sent to the e-mail address first; if that is unsuccessful, it will be sent using a fax number, if provided; if that is unsuccessful, it will be sent via US Mail.*

| Email: | patent@ferraiuoli.com |
|---|---|
| Correspondent Name: | FERRAIUOLI LLC |
| Address Line 1: | 221 PONCE DE LEON AVE. 5TH FL |
| Address Line 4: | SAN JUAN, PUERTO RICO 00917 |

| ATTORNEY DOCKET NUMBER: | 2400.1 |
|---|---|
| NAME OF SUBMITTER: | RAFAEL RODRIGUEZ |
| SIGNATURE: | /Rafael Rodriguez/ |
| DATE SIGNED: | 04/24/2017 |

**Total Attachments: 7**
source=Ariel-RBDS Patent Assignment Cover Sheet#page2.tif
source=Ariel-RBDS Patent Assignment Cover Sheet#page3.tif
source=Ariel-RBDS Patent Assignment Cover Sheet#page4.tif

Case 1:22-cv-01011-JJM-WC Document 39-1 Filed 11/06/24 Page 130 of

source=Ariel-RBDS Patent Assignment Cover Sheet#page5.tif

source=Ariel_RBDS_Assignment-signed_Final#page1.tif

source=Ariel_RBDS_Assignment-signed_Final#page2.tif

source=Ariel_RBDS_Assignment-signed_Final#page3.tif

**PATENT**
**REEL: 042109 FRAME: 0970**

503201962     03/03/2015

## PATENT ASSIGNMENT COVER SHEET

Electronic Version v1.1
Stylesheet Version v1.2

EPAS ID: PAT3248577

| SUBMISSION TYPE: | NEW ASSIGNMENT |
|---|---|
| NATURE OF CONVEYANCE: | ASSIGNMENT |

### CONVEYING PARTY DATA

| Name | Execution Date |
|---|---|
| ARIEL INVENTIONS, LLC | 02/25/2015 |

### RECEIVING PARTY DATA

| | |
|---|---|
| Name: | ROTHSCHILD BROADCAST DISTRIBUTION SYSTEMS, LLC |
| Street Address: | 401 EAST LAS OLAS BLVD., SUITE #1400 |
| City: | FORT LAUDERDALE |
| State/Country: | FLORIDA |
| Postal Code: | 33301 |

### PROPERTY NUMBERS Total: 2

| Property Type | Number |
|---|---|
| Patent Number: | 8856221 |
| Patent Number: | 8307089 |

### CORRESPONDENCE DATA

**Fax Number:** (310)203-0567

*Correspondence will be sent to the e-mail address first; if that is unsuccessful, it will be sent using a fax number, if provided; if that is unsuccessful, it will be sent via US Mail.*

Phone: 310-203-8080
Email: patentdocket@jmbm.com
Correspondent Name: JEFFER MANGELS BUTLER & MITCHELL LLP
Address Line 1: 1900 AVENUE OF THE STARS, 7TH FLOOR
Address Line 4: LOS ANGELES, CALIFORNIA 90067

| ATTORNEY DOCKET NUMBER: | 74855-0001 |
|---|---|
| NAME OF SUBMITTER: | BRENNAN C. SWAIN |
| SIGNATURE: | /Brennan C. Swain/ |
| DATE SIGNED: | 03/03/2015 |

**Total Attachments: 3**
source=74855-0001 Patent Assignment - Rothschild Broadcast -signed#page1.tif
source=74855-0001 Patent Assignment - Rothschild Broadcast -signed#page2.tif
source=74855-0001 Patent Assignment - Rothschild Broadcast -signed#page3.tif

PATENT
REEL: 035074 FRAME: 0541

PATENT
REEL: 042109 FRAME: 0971

## ASSIGNMENT OF PATENT RIGHTS

For good and valuable consideration, the receipt of which is hereby acknowledged, Ariel Inventions LLC , a Florida corporation limited liability company having an address at 401 East Las Olas Blvd Suite #1400 Fort Lauderdale, Fla. ("**Assignor**"), does hereby sell, assign, transfer, and convey unto Rothschild Broadcast Distribution Systems, LLC, a Florida limited liability company, having an address at 401 East Las Olas Blvd Suite #1400 Fort Lauderdale, Fla. , ("**Assignee**"), or its designees, all right, title, and interest that exist today and may exist in the future in and to any and all of the following (collectively, the "**Patent Rights**"):

(a) the patent applications and patent listed in the table below (the "**Patent**");

| Patent or Application No. | Country | Filing Date | Title of Patent and First Named Inventor |
|---|---|---|---|
| 8,856,221 | US | October 14, 2012 | System and Method for Storing Broadcast content in a cloud-based computing environment<br><br>Leigh M. Rothschild |
| 8,307,089 | US | November 21, 2011 | System and Method for Storing Broadcast content in a cloud-based computing environment<br><br>Leigh M. Rothschild |

(b) all patents and patent applications (i) to which the Patent directly or indirectly claims priority, (ii) for which the Patent directly or indirectly forms a basis for priority, and/or (iii) that were co-owned applications that directly or indirectly incorporate by reference, or were incorporated by reference into, the Patent;

(c) all reissues, reexaminations, extensions, continuations, continuations in part, continuing prosecution applications, requests for continuing examinations, divisions, registrations of any item in any of the foregoing categories (a) and (b);

1

(d)     all inventions, invention disclosures, and discoveries described in any item in any of the foregoing categories (a) through (c) and all other rights arising out of such inventions, invention disclosures, and discoveries;

(e)     all rights to apply in any or all countries of the world for patents, certificates of invention, utility models, industrial design protections, design patent protections, or other governmental grants or issuances of any type related to any item in any of the foregoing categories (a) through (d), including, without limitation, under the Paris Convention for the Protection of Industrial Property, the International Patent Cooperation Treaty, or any other convention, treaty, agreement, or understanding;

(f)     all causes of action (whether known or unknown or whether currently pending, filed, or otherwise) and other enforcement rights under, or on account of, the Patent and/or any item in any of the foregoing categories (b) through (e), including, without limitation, all causes of action and other enforcement rights for

(i)     past, present, and future damages,
(ii)    injunctive relief, and
(iii)   any other remedies of any kind for past, present, and future infringement; and

(g)     all rights to collect royalties and other payments under or on account of the Patent and/or any item in any of the foregoing categories (a) through (f).

Assignor represents, warrants and covenants that:

(1)     Assignor has the full power and authority, and has obtained all third party consents, approvals and/or other authorizations required to enter into the Letter Agreement and to carry out its obligations hereunder, including the assignment of the Patent Rights to Assignee; and

(2)     Assignor owns, and by this document assigns to Assignee, all right, title, and interest to the Patent Rights, including, without limitation, all right, title, and interest to sue for infringement of the Patent Rights. Assignor has obtained and properly recorded previously executed assignments for the Patent Rights as necessary to fully perfect its rights and title therein in accordance with governing law and regulations in each respective jurisdiction. The Patent Rights are free and clear of all liens, claims, mortgages, security interests or other encumbrances, and restrictions. There are no actions, suits, investigations, claims or proceedings threatened, pending or in progress relating in any way to the Patent Rights. There are no existing contracts, agreements, options, commitments, proposals, bids, offers, or rights with, to, or in any person to acquire any of the Patent Rights.

Assignor hereby authorizes the respective patent office or governmental agency in each jurisdiction to issue any and all patents, certificates of invention, utility models or

2

PATENT
REEL: 035074 FRAME: 0543

PATENT
REEL: 042109 FRAME: 0973

other governmental grants or issuances that may be granted upon any of the Patent Rights in the name of Assignee, as the assignee to the entire interest therein.

Assignor will, at the reasonable request of Assignee and without demanding any further consideration therefore, do all things necessary, proper, or advisable, including without limitation, the execution, acknowledgment, and recordation of specific assignments, oaths, declarations, and other documents on a country-by-country basis, to assist Assignee in obtaining, perfecting, sustaining, and/or enforcing the Patent Rights. Such assistance will include providing, and obtaining from the respective inventors, prompt production of pertinent facts and documents, giving of testimony, execution of petitions, oaths, powers of attorney, specifications, declarations or other papers, and other assistance reasonably necessary for filing patent applications, complying with any duty of disclosure, and conducting prosecution, reexamination, reissue, interference or other priority proceedings, opposition proceedings, cancellation proceedings, public use proceedings, infringement or other court actions and the like with respect to the Patent Rights.

The terms and conditions of this Assignment of Patent Rights will inure to the benefit of Assignee, its successors, assigns, and other legal representatives and will be binding upon Assignor, its successors, assigns, and other legal representatives.
IN WITNESS WHEREOF this Assignment of Patent Rights is executed at _Miami, Florida_ on _February 25, 2015_____.

**ASSIGNOR:**

for Ariel Inventions, LLC.

By: _____

RECORDED: 03/03/2015

**PATENT**
**REEL: 035074 FRAME: 0544**

**PATENT**
**REEL: 042109 FRAME: 0974**

## ASSIGNMENT OF PATENT RIGHTS

For good and valuable consideration, the receipt of which is hereby acknowledged, Ariel Inventions LLC , a Florida corporation limited liability company having an address at 401 East Las Olas Blvd Suite #1400 Fort Lauderdale, Fla. ("**Assignor**"), does hereby sell, assign, transfer, and convey unto Rothschild Broadcast Distribution Systems, LLC, a ~~Florida~~ Texas limited liability company, having an address at ~~401 East Las Olas Blvd Suite #1400 Fort Lauderdale, Fla.~~ 1400 Preston Road, Suite 400, Plano, TX 75093, ("Assignee"), or its designees, all right, title, and interest that exist today and may exist in the future in and to any and all of the following (collectively, the "**Patent Rights**"):

(a)    the patent applications and patent listed in the table below (the "Patent");

| Patent or Application No. | Country | Filing Date | Title of Patent and First Named Inventor |
|---|---|---|---|
| 8,856,221 | US | October 14, 2012 | System and Method for Storing Broadcast content in a cloud-based computing environment<br><br>Leigh M. Rothschild |
| 8,307,089 | US | November 21, 2011 | System and Method for Storing Broadcast content in a cloud-based computing environment<br><br>Leigh M. Rothschild |

(b)    all patents and patent applications (i) to which the Patent directly or indirectly claims priority, (ii) for which the Patent directly or indirectly forms a basis for priority, and/or (iii) that were co-owned applications that directly or indirectly incorporate by reference, or were incorporated by reference into, the Patent;

(c) all reissues, reexaminations, extensions, continuations, continuations in part, continuing prosecution applications, requests for continuing examinations, divisions, registrations of any item in any of the foregoing categories (a) and (b);

*lmr*    022517    1

(d) all inventions, invention disclosures, and discoveries described in any item in any of the foregoing categories (a) through (c) and all other rights arising out of such inventions, invention disclosures, and discoveries;

(e) all rights to apply in any or all countries of the world for patents, certificates of invention, utility models, industrial design protections, design patent protections, or other governmental grants or issuances of any type related to any item in any of the foregoing categories (a) through (d), including, without limitation, under the Paris Convention for the Protection of Industrial Property, the International Patent Cooperation Treaty, or any other convention, treaty, agreement, or understanding;

(f) all causes of action (whether known or unknown or whether currently pending, filed, or otherwise) and other enforcement rights under, or on account of, the Patent and/or any item in any of the foregoing categories (b) through (e), including, without limitation, all causes of action and other enforcement rights for

(i) past, present, and future damages, (ii) injunctive relief, and (iii) any other remedies of any kind for past, present, and future infringement; and

(g) all rights to collect royalties and other payments under or on account of the Patent and/or any item in any of the foregoing categories (a) through (f).

Assignor represents, warrants and covenants that:

(1) Assignor has the full power and authority, and has obtained all third party consents, approvals and/or other authorizations required to enter into the Letter Agreement and to carry out its obligations hereunder, including the assignment of the Patent Rights to Assignee; and

(2) Assignor owns, and by this document assigns to Assignee, all right, title, and interest to the Patent Rights, including, without limitation, all right, title, and interest to sue for infringement of the Patent Rights. Assignor has obtained and properly recorded previously executed assignments for the Patent Rights as necessary to fully perfect its rights and title therein in accordance with governing law and regulations in each respective jurisdiction. The Patent Rights are free and clear of all liens, claims, mortgages, security interests or other encumbrances, and restrictions. There are no actions, suits, investigations, claims or proceedings threatened, pending or in progress relating in any way to the Patent Rights. There are no existing contracts, agreements, options, commitments, proposals, bids, offers, or rights with, to, or in any person to acquire any of the Patent Rights.

Assignor hereby authorizes the respective patent office or governmental agency in each jurisdiction to issue any and all patents, certificates of invention, utility models or other governmental grants or issuances that may be granted upon any of the Patent Rights in the name of Assignee, as the assignee to the entire interest therein.

2

*lmr*

022517

**PATENT**
**REEL: 042109 FRAME: 0976**

Assignor will, at the reasonable request of Assignee and without demanding any further consideration therefore, do all things necessary, proper, or advisable, including without limitation, the execution, acknowledgment, and recordation of specific assignments, oaths, declarations, and other documents on a country-by-country basis, to assist Assignee in obtaining, perfecting, sustaining, and/or enforcing the Patent Rights. Such assistance will include providing, and obtaining from the respective inventors, prompt production of pertinent facts and documents, giving of testimony, execution of petitions, oaths, powers of attorney, specifications, declarations or other papers, and other assistance reasonably necessary for filing patent applications, complying with any duty of disclosure, and conducting prosecution, reexamination, reissue, interference or other priority proceedings, opposition proceedings, cancellation proceedings, public use proceedings, infringement or other court actions and the like with respect to the Patent Rights.

The terms and conditions of this Assignment of Patent Rights will inure to the benefit of Assignee, its successors, assigns, and other legal representatives and will be binding upon Assignor, its successors, assigns, and other legal representatives.

IN WITNESS WHEREOF this Assignment of Patent Rights is executed at <u>Miami, Florida</u> on <u>February 25, 2015</u>.

ASSIGNOR:

By: _____ for Ariel Inventions, LLC

*lmr*    3

**PATENT**    022517
**REEL: 042109 FRAME: 0977**